1  ROGER A. CARNAGEY (SBN 79005)
   Attorney at Law
2  One Kaiser Plaza, Suite 601
   Oakland, CA 94612
3  (510) 452-5005
   (510) 451-2944 fax
4
   Attorney for Plaintiff
5  EDWARD LEVINE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD LEVINE,<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF ALAMEDA, a California Charter City, and JAMES M. FLINT, both individually and as City Manager for the City of Alameda,<br><br>    Defendants.<br>_____/ | Case No. C04-01780 CRB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: September 2, 2005<br>Time: 8:30 a.m.<br>Place: Courtroom No. 8, 19th Floor<br>         Hon. Charles R. Breyer |

**I.    STATEMENT OF PARTIES' ATTENDANCE**

Plaintiff Edward Levine has the exclusive decisionmaking authority with regards to settlement of this case. He will attend the mediation along with his attorney.

**II.    OTHER PARTIES**

Plaintiff is not aware of any persons or entities connected with either party whose attendance might substantially enhance settlement prospects other than defendants City and Flint.

**III.    STATEMENT OF CASE**

    **A.    STATEMENT OF FACTS**

        1.    <u>Employment History</u>

            a.    <u>Prior to Working for City of Alameda</u>

Prior to joining the City of Alameda in July 1995, Mr. Levine was employed for over 20 years managing large public and private sector real estate redevelopment projects. Work included project

planning, feasibility analysis, managing building design and public approvals, negotiating development agreements, overseeing bidding and construction and leasing. From 1989 to 1995, as Director of Facilities Planning and Management for the University of California's Hastings College of Law, he was in charge of redevelopment of the College's surplus properties and leasing and management of its office/commercial and residential properties. Between 1980 and 1989, as Project Manager for Santa Fe Pacific Realty (the real estate subsidiary of the Southern Pacific and Santa Fe Railroads), he managed the development of a number of large industrial park projects, office buildings and hotels. From 1975 to 1980,l as a licensed Civil Engineer, he designed and oversaw construction of a number of office and residential buildings. Mr. Levine holds a bachelors degree in Civil Engineering from the City University of New York and masters degrees in civil engineering and architecture from the University of Minnesota and University of California, Berkeley.

### b. Employment with the City of Alameda

Mr. Levine was hired as Facilities Manager by the Alameda Reuse and Redevelopment Authority (ARRA) in July 1995. The ARRA was the Joint Powers Authority (JPA) created by the State pursuant to Federal legislation to serve as the Local Reuse Authority (LRA) to oversee redevelopment of the former Alameda Naval Air Station. The ARRA was originally governed by a Board of Directors which included the five City Councilmembers from Alameda and four other members representing the cities of Oakland and San Leandro, Alameda County and the local Congressional office. Although the ARRA was technically separate and independent of the City of Alameda, its Executive Director and employees reported to the Alameda City Manager and all of its administrative functions (payroll human resources, office and technical support, etc.) were provided by the City. In 1999, the ARRA Board was reconstituted to include only the five members of the Alameda City Council. It was subsequently decided that the ARRA should be absorbed into the City and that ARRA employees should become City employees covered under civil service.

As Facilities Manager, Mr. Levine's primary responsibility was for leasing, property management and overseeing building upgrades for the over 200 buildings (constituting approximately 3.5 million square feet of leasable space) at the form Naval Air Station (renamed Alameda Point) and

MEMO OF POINTS & AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT    2

the nearby Fleet Industrial Supply Center (FISC property) which was acquired by the City from the Navy in a separate conveyance. Although his job focused on leasing and property management, Mr. Levine was involved in a variety of other projects and duties relating to the redevelopment process. These included negotiations with the Navy regarding a Master Lease for the entire base, working with the State to include the base within an enterprise zone, coordinating with the City Planning Department to obtain use permits for all proposed leases, managing major studies of base infrastructure and building upgrade requirements, negotiating a port services agreement with the Maritime Administration, and ongoing coordination with citizen advisory groups. In December 1999 Mr. Levine was made a full-time civil service employee of the City and his job classification was changed to Economic Development Manager. (This was an existing civil service job classification with Code No. 1711). In October 2000, the Economic Development Manager classification was revised to become Leasing and Property Manager.

In about December 2001, leasing and property management responsibility was transferred to a consortium of private sector developers -- Alameda Point Community Partners (APCP) -- which was selected as the master developer for the base. At this time Mr. Levine was assigned project management responsibilities for interim use and development of the approximately 220 acre property in the northwest corner of the base designated for development of a golf course and resort hotel. This area had been excluded from the remainder of the base which was to be managed by APCP. Mr. Levin's new job involved managing the project EIR and permitting process (permits were required from BCDC, RWQCB, Corps of Engineers), obtaining public input and concurrence regarding the plan, managing engineering design of the system needed to import approximately 1.0 million cubic yards of dredge material to construct the golf course, coordinating with the Navy regarding testing standards and protocols for dredge import and remediation of toxic materials, negotiating with potential dredge material sources, negotiating interim ground leases covering portions of the property, preparing project feasibility analyses, soliciting proposals from interested developers, management of project budget and schedule, coordination and oversight of work by consultants and the City staff, and preparation of status reports to the City Council and others as required.

Mr. Levine's job classification did not preclude working on projects other than the golf course/hotel development. In December 2003 he was assigned project management duties for the development of a 30,000 square foot office building (including infrastructure to be provided by the City) for ACET (Advancing California's Emerging Technologies), an organization which assists high-tech start-up companies. At the time of his termination in February 2004, the ACET project occupied between 50% and 75% of Mr. Levine's work load.

    c.  Post-Termination

Mr. Levine was informed of his termination on February 19, 2004 (not the February 17 date shown on the layoff memorandum). He had recently celebrated his 61st birthday earlier in the month. After almost nine years of productive and loyal service to the City, Mr. Levine was given only seven working days notice before his termination date. Needless to say, no severance was offered. The termination came as a complete and utter surprise. Mr. Levine enjoyed the variety and challenge posed by his job and had excellent rapport with his co-workers. He had intended to remain with the City of Alameda until he retired at the age of 65. One can appreciate his disbelief and unhappiness when he was presented with the termination letter. This was only compounded when Jim Flint's last words to him as he walked by Mr. Levine's office on his last day of work were, "smile, Ed."

Mr. Levine had gone through a protracted job search on two occasions during his 30-year career. The first was in 1989 when he was laid off from Santa Fe Pacific Realty following a hostile takeover of the company. At that time Mr. Levine was covered by a generous severance package. Despite excellent qualifications, it took almost ten months for him to land his new position with the University of California, Hasting. Mr. Levine's other protracted search occurred when he was given almost a full year's notice by Hastings that his position was to be eliminated. After months of networking and dead end job applications, Mr. Levine landed the Facilities Manager position with ARRA. His job search had thioneine almost 11 months.

Given this experience, Mr. Levine was pessimistic about his chances for obtaining a position comparable to the one he held at Alameda. In addition to the usual obstacles, he believed his age would be the single biggest factor working against him. At 61 most people are getting ready

MEMO OF POINTS & AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT 4

to retire, not looking for a new job. Discussions with friends and colleagues reinforced his negative expectations. The consensus was that at best he might land some limited consulting assignments. Any prospect of obtaining a desirable full time position seemed remote. This was underscored when his proposal to provide consulting services to ACET (on the development project which he previously managed for the City) was rejected.

Under the circumstances (no severance, poor prospects for landing a new job, and limited financial resources) Mr. Levine's other option was to initiate his early retirement benefits through the Public Employees' Retirement System and Social Security. Over the last year Mr. Levine continued to pursue job opportunities, performed limited consulting work, and reconstituted his investment portfolio. He has not received any offers of comparable employment that he enjoyed with defendant City.

**B.     PERFORMANCE IMPROVEMENT PLAN**

In late October 2003, Flint ordered that Levine be put on a performance improvement plan by his supervisor, Debbie Potter. The basis of the Flint decision concerned Levine's use of "new" information (taxpayer funding of the Alameda Point golf/resort project), which had allegedly not been previously disclosed to Flint, at an October 2003 closed session of the ARRA/City Council. However, the evidence will show that such a funding option was repeatedly and clearly outlined in a number of documents presented by the ARRA staff to Levine's superiors as early as Fall 2002. Thus, Flint's claim that he was unaware of these funding issues until the October 2003 closed session is dubious.

Another basis for the PIP, as stated by Flint at his deposition, was "performance" problems. However, Mr. Flint was unable to articulate any precise performance problems with Levine except for the October 2003 "closed" session issue and an incident regarding an event, Cyberfest, that occurred in 1997. There is absolutely no documentation of any of these performance problems in the record (including defendants' document productions and Levine's personnel file). Although Flint also testified that there were other "process" problems with Levine's performance, he could not identify a single specific problem at his deposition. On the contrary, Flint merely generalized his concerns.

As to the Cyberfest incident, Flint utilized an undocumented incident of almost seven years

ago to justify the imposition of a PIP on Levine in 2003. Moreover, the evidence will show that after the Cyberfest incident (which was approved through public hearings) Mr. Flint personally approved the retention of Levine in higher positions of responsibility with the City.

Additionally, Levine's immediate supervisor, Ms. Potter, testified in her deposition that she not only expressed disagreement and concern to Mr. Flint when he directed her to develop a PIP for Levine, but there were no other "performance" problems that she had experienced as Levine's supervisor aside from Flint's "perception" that new information was withheld by Levine at the October 2003 "closed" session. In fact, Mr. Levine testified that he had urged Flint to postpone the October 2003 "closed" session presentation because he felt that the staff was unprepared to answer some of the questions that may be asked. Flint was the authority that directed Levine to go forward with the meeting as scheduled.

### C.  THE PURPORTED LAYOFF OF LEVINE

The interoffice memorandum dated February 17, 2004 from Jim Flint to Ed Levine regarding "Layoff" states:

> ...As a result of the ARRA's sudden recent action to indefinitely suspend development efforts on the Alameda Point Golf Course and hotel complex, the ARRA will no longer continue to fund your position. As you know, your position as Property Development Manager is completely funded by the ARRA. Because the ARRA has withdrawn funding for this project your position is being eliminated.

While Ms. Potter was drafting and developing the PIP in February 2004, defendant Flint issued this layoff notice to Levine, effective February 27, 2004. The stated basis for the layoff was the cessation of funding for Mr. Levine's "working" position as golf course project manager. Ms. Potter told Flint that the layoff notice was "inconsistent" with the pending PIP process.

The ARRA did not indefinitely suspend development efforts on the Alameda Point Golf Course and hotel complex. The ARRA directed staff to suspend the developer selection process but endorsed the staff recommendation that work continue relating to site remediation; completion of the EIR and permitting for import of dredge material; and negotiation of a tipping fee for receipt of dredge material in anticipation of the future development of the golf course. Testimony by Debbie Potter and Elizabeth Johnson confirmed that these activities continued following Mr. Levine's

termination and constituted continuing predevelopment work on the property.

In fact, the evidence will show that, during the entire course of his City employment, Mr. Levine performed a myriad of duties for the City. (See Statement of Facts, subsection 6). Although the City submits that Levine's job duties were limited to only the golf course/hotel resort project at the time of his layoff, this position is belied by the deposition testimony of Potter and Levine that plaintiff performed numerous other duties, including assignment to the ACET project in late 2003, a position <u>not</u> funded by ARRA funds. This project was ongoing until August 2004 when funding problems led to its suspension. Additionally, pre-existing redevelopment activities on the golf course project, such as permitting, Environmental Impact Reports, dredging issues, negotiations with the U.S. Navy and others were previously coordinated by Mr. Levine in his position as Property Development Manager. Plaintiff has not received any documentation that Mr. Levine's position as Property Development Manager was "completely" (or even partially) funded by the ARRA. There is certainly nothing in the job classification for this position regarding funding sources or restrictions. In fact, there is nothing in the job classification which limits work by the Property Development Manager to ARRA related projects. The job description is general in nature and allows work on a variety of redevelopment projects, both at Alameda Point or elsewhere in the City.

Since the above-referenced predevelopment activities continued, funding was obviously allocated to cover the cost of consultant and staff time and resources. All consultant work and staff work on the project was managed or coordinated by Mr. Levine. Additionally, Mr. Levine was responsible for preparation of consultant contracts and budgets and signed off on all consultant invoices. To date, the City has refused to provide a detailed breakdown of project expenditures for consultants and staff following Mr. Levine's termination. The City argues that such information is not relevant to this litigation.

Subsequent to Levine's February 2004 layoff, these same job assignments were reassigned to Debbie Potter and Elizabeth Johnson, the latter having been directed by the City Manager's office to convert her part-time position (20 hours per week) to full-time (36.5 hours per week) in early March 2004. Ms. Johnson had been a part-time employee since 1999, when she reduced her work week in order to raise a family. Ms. Johnson testified that she assumed responsibility for the bulk of the EIR

and permitting work on the golf course/hotel project which had previously been performed by Mr. Levine. Ms. Johnson further testified that prior to his termination she reported to and received direction from Mr. Levine regarding all aspects of her work on the golf course/hotel project.

It is also noteworthy that the City hired a new hire, Stephen Proud, and promoted an existing employee, Lucretia Akil, into positions that subsumed at least some of Mr. Levine's existing work duties as of his layoff date.

Within weeks after Mr. Levine's termination the City hired a new Redevelopment Manager, Steven Proud, who was assigned to oversee negotiations with the Navy and reparation of a master redevelopment plan for Alameda Point. Ms. Potter testified that Mr. Proud assumed responsibility for some of the work that she had previously done and that their work was closely intertwined. In order for Ms. Potter to clear time to absorb portions of Mr. Levine's workload (particularly the ACET project), she needed to share some of her existing work duties with Mr. Proud. Some or all of the work assigned to Mr. Proud would have been assigned to Mr. Levine had he not been terminate.

Ms. Potter testified that a junior level management analyst, Lucretia Akil, was hired to work in her division very soon after Levine's termination. Ms. Potter testified that Ms. Akil had been assigned oversight responsibility for LAMBRA activities (LAMBRA is the State's designation for enterprise zones at former military bases), a function previously handled by Mr. Levine's group.

During 2003, certain work which had been performed by Levine as the Leasing and Property Manager (particularly negotiation of a new agreement with the Maritime Administration "MARAD" and review of lease renewals) was assigned to Nanette Banks in the Finance and Administration Division. Based on his experience negotiating the original MARAD agreement in 1997 and over 100 leases for building space at Alameda Point, this work should have been assigned to Levine.

Ms. Johnson testified that several consultant contracts for work relating to the golf course/hotel project which had previously been managed by Mr. Levine remain active up through the present. These contracts, which are currently managed by Ms. Johnson, cover a variety of engineering and planning services relating to EIR preparation and certification, permitting, engineering design for import of dredge material, site remediation, and coordination with the Navy regarding testing

standards and protocols for importing dredge material. All of this work was previously managed by Mr. Levine.

Lastly, the City intends to eventually complete the project based upon multi-year projections and continues to fund much of the work done by the aforementioned employees with AP Bond funds, which are the same as the "ARRA funding" referred to in defendant Flint's February 17, 2004 layoff notice to Levine.

### IV. <u>LEGAL ISSUES</u>