LINDA A. TRIPOLI (SBN 100389)
Attorney at Law
One Blackfield Drive, No. 403
Tiburon, California 94920
Telephone: (415) 380-8822
Facsimile: (415) 380-8868

Attorney for Defendants
CITY OF ALAMEDA and JAMES FLINT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

EDWARD LEVINE,

        Plaintiff,

    vs.

CITY OF ALAMEDA, a California Charter
City, and JAMES M. FLINT, both
individually and as City Manager for the
City of Alameda,

        Defendants.

Case No. C04-01780 CRB/ADR

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR
SUMMARY JUDGEMENT**
**[Fed. R. Civ. P. 56]**

Date:     September 2, 2005
Time:    10:00 a.m.
Ctrm.:   8 (19th Floor)

Trial Date: None

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................1

II.     STATEMENT OF FACTS ....................................................1

III.    STATEMENT OF ISSUES TO BE DECIDED ........................7

IV.     LEGAL ARGUMENT.........................................................8

A. Defendants' Are Entitled To Judgment As A Matter Of Law On Each Of Plaintiff's
    Claims Because The Undisputed Material Facts Establish That At Least One Element
    Of Each Of Plaintiff's Claims Cannot Be Established Or There Is A Complete
    Defense..........................................................................8

B. Individual Defendant Flint Is Entitled To Judgment On Plaintiff's Second Claim For
    Relief For Age Discrimination Under FEHA Because Such A Claim Cannot Be Pled
    Against An Individual Defendant As A Matter of Law.......................................8

C. Defendant City Of Alameda Is Entitled To Judgment On Plaintiff's Second Claim
    For Relief For Age Discrimination Under FEHA Because Plaintiff Cannot Establish
    The Existence Of Several Elements Essential To That Claim For Relief As A Matter
    Of Law ...........................................................................9

        1. Plaintiff Cannot Establish A *Prima Facie* Case Of Age Discrimination .....................10

        2. The City Had Legitimate, Non-Discriminatory Reasons For Laying Plaintiff Off .......15

        3. Even If Plaintiff Could Succeed In Establishing A *Prima Facie* Case Of Age
            Discrimination, He Has No Specific and Substantial Evidence Sufficient To Prove
            That The Reason For His Layoff Was A Pretext For Intentional Age Discrimination .....15

D. Defendants Are Entitled To Judgment On Plaintiff's First Claim For Relief For
    Deprivation Of Due Process Under 42 USC §1983 Because Plaintiff Cannot
    Establish Any Underlying Violation Of A Federal Right, Because Defendant Flint Is
    Entitled To Qualified Immunity And Because Plaintiff Cannot Establish That There
    Was A Policy Or Custom In Place Such As To Trigger Liability Against Defendant
    City of Alameda ....................................................................19

        1. Plaintiff Cannot Establish Any Deprivation Of Due Process ........................................19

          2. Defendant Flint Is Entitled To Qualified Immunity ........................................................24

          3. Plaintiff Has Not Proven The Existence Of A Policy or Custom Of Denying Due

          Process To Employees Facing Layoff And Thus Cannot Establish Liability Against

          Defendant City Of Alameda ........................................................................................25

V.   CONCLUSION ..................................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**CASES**

*Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, (9th Cir. 1996)................................ 16

*Burrell v. City of Los Angeles,* 209 Cal.App.3d 568 (1989)...................................... 22

*Caldwell v. Paramount Unified School District,* 41 Cal. 4th 189, 203 (1995)............................ 15

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ................................................ 8

*Clark v. Claremont University Center,* 6 Cal. App.4[th] 639, 664 (1992)..................................... 16

*Clements v. Airport Authority,* 69 F.3d 321 (9th Cir. 1995)........................................... 19, 20, 21

*Coghlan v. American Seafoods Company LLC,* 2005 U.S.App. LEXIS 13459, 13 and 21, (9th Cir. 2005). ......................................................... 16, 17

*Coleman v. Department of Personnel Administration,* 52 Cal.3d 1102 (1991).................... 23, 24

*Coleman v. The Quaker Oats Company,* 232 F.3d 1271, 1281 (9th Cir. 2000). .............. 10, 15, 16

*Dwyer v. Regan,* 777 F.2d 825 (2nd Cir. 1985) ................................................ 21, 23

*Gibbs v. Consolidated Services,* 111 Cal.App.4[th] 794, 800 (2003) ................................ 13

*Guz v. Bechtel National, Inc.,* 24 Cal.4[th] 317, 358 (2000) ...................................... 16

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982). ................................................ 24

*Hersant v. California Department of Social Services,* 57 Cal. App. 4th 997, 1005 (1997) ......... 16

*Horn v. Cushman & Wakefield Western, Inc.* 72 Cal.App.4[th] 798, 809 (1999),...................... 17

*Kreutzer v. County of San Deigo,* 153 Cal.App.3d 62, 20 (1984). ............................... 25

*Maraziti v. First Interstate Bank,* 953 F.2d. 520, 523 (1992)**.**...................................... 24

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). ...................................... 9

*Mennig v. City Council,* 86 Cal.App.3d 341 (1978). ............................................ 22

*Mixon v. Fair Employment and Housing Commission,* 192 Cal.App. 3d 1306, 1317-1319 (1987); ................................................................ 9

*Monell v. Department of Social Services,* 436 U.S. 658, 691 (1978) .......................... 25

*Nesbit v Pepsico, Inc.,* 994, F.2d 703, 705, (9th Cir. 1993)...................................... 19

*Nidds v. Schindler Elevator Corporation,* 113 Cal.App 912, 918-19 (9th Cir. 1996),............. 10, 16, 19

*Perry v. Sindermann,* 408 U.S. 593, 603 (1972) ............................................ 23

*Proud v. Stone,* 945 F.2d 796, 797 (1991) ................................................................ 17

*Rose v. Wells Fargo & Co.,* 902 F.2d 1417 (9th Cir. 1990) ........................................ 10, 13, 15, 19

*St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-508 (1993); ............................... 9

*Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) ........................................ 16

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254-256 (1981); ............................ 9

*Wallis v. J.R.. Simplot Co.,* 26 F.3d 885, 891 (9th Cir. 1994) .................................. 10, 16

## **STATUTES**

42 U.S.C. §1983 .......................................................................................... 19, 21, 25

## **TREATISES**

Schwarzer, Tashima & Wagstaffe, *Cal. Prac. Guide: Fed. Civ. Pro. Before Trial* (The Rutter

Group 2003), §14:4. .......................................................................................... 8

## I.   INTRODUCTION

The undisputed material facts in this case establish Plaintiff Edward Levine cannot establish a *prima facie* case for age discrimination because, in the most simplest of terms, he was the project manager for a proposed golf course and hotel project and the project was suspended because it was financially unfeasible.  Plaintiff does not and cannot dispute those facts.  While different circumstances saved Plaintiff from layoff in 2002, those circumstances did not exist in February 2004, when Plaintiff was laid off.  As shown more fully below, even if Plaintiff could establish a *prima facie* case of age discrimination, Plaintiff was laid off based on a legitimate, non-discriminatory business reason and he cannot carry his burden of showing that such reason (the suspension of the golf course project) was a pretext for intentional age discrimination.  Nor can Plaintiff establish a viable claim for violation of 42 U.S.C. §1983.  Plaintiff was provided with notice of his layoff and the reason for his layoff and was provided with an opportunity to respond, of which he availed himself.  Plaintiff requested no additional due process nor was he entitled to any additional due process.  Plaintiff's claim under §1983 also fails because he cannot defeat individual Defendant Flint's qualified immunity.  Nor has he pled, much less proven, the existence of a policy, regulation, ordinance or custom of Defendant City of Alameda denying due process to employees being laid off.

## II.   STATEMENT OF FACTS

The Alameda Reuse and Redevelopment Authority (ARRA) was formed under the Base Reuse and Closure Act to be the "local reuse authority" to oversee the transition of ownership of the former Alameda  Naval Air Station from the U. S. Navy to the City of Alameda.  The ARRA Governing Body is a Joint Powers Authority and is comprised of the five members of City of Alameda City Council, sitting in their capacity as members of the City Council and also as members of the Community Improvement Commission (CIC).

Plaintiff Ed Levine was originally hired by the City of Alameda in June 1995 as a Facilities Manager to perform property management functions on behalf of the ARRA relative to the former Alameda Naval Air Station property.  As Plaintiff's position was funded by a federal contract, he was classified as a non-civil service employee.  In 1999, Defendant City

Manager James Flint determined that federally funded, non-civil service City of Alameda employees assigned to the ARRA, including Plaintiff, should be given civil service status equal to that of regular City of Alameda employees.

In 2002, the ARRA decided to contract with a private company, the Alameda Point Community Partners (APCA), to provide the development and property management services then being performed by ARRA employees including Plaintiff. As a result, Plaintiff and his two subordinates were slated to be laid off. One of Plaintiff's subordinates resigned in anticipation of being laid off and Plaintiff's other subordinate was laid off effective June 28, 2002. Instead of laying Plaintiff off, City Manager Flint retained Plaintiff and assigned him to manage the proposed ARRA Alameda Point Golf Course and Hotel project. Plaintiff's working job title was Golf Course Project Manager.[1] Flint made that decision despite a prior concern about Levine's performance. Flint Depo. 26:9-28:7; 46:4-19; 52:23-53:20; 77:4-6; Potter Depo. 64:10-65:2; 84:24-86:5; Decl. of Willis, ¶¶2-3[2]

In June 2001, the feasibility of developing a golf course and hotel project at Alameda Point was first assessed by Economic Research Associates (ERA), consultants specializing in golf course and hotel development. ERA concluded that it would be feasible to develop the hotel and golf course together but that it would not be feasible to develop the golf course without the hotel.

In April 2002, the ARRA issued "Requests for Qualifications" to obtain preliminary information regarding qualifications from hotel developers/operators. The ARRA received four responses. All responses proposed that the project be financed with tax exempt bonds which would allow for lower interest rates, thereby improving project feasibility and reducing public subsidy requirements.

---

[1] On October 2, 2002, Plaintiff's job title was officially changed, within the parameters of the City's Civil Service classification system, from Leasing and Property Manager to the classification of Property Development Manager, the Civil Service classification title for the Golf Course Project Manager position. Plaintiff had already been performing the duties of Gold Course Project Manager. Declaration of Willis, ¶¶2.

[2] Accompanying these Point and Authorities is the Declaration of Linda A. Tripoli (in two parts) which attaches true and correct copies of deposition excerpts and deposition exhibits referenced herein.

In May 2003, all four hotel developers/operators who responded to the RFQ were invited to advance to the "Request for Proposal" stage to make specific proposals for the development of the golf course and hotel project to include the proposed hotel program, architectural design, operating projections, developer and operator fees and development costs. However, by this time, it was apparent that the downturn in the hospitality industry following the terrorist attacks of September 11, 2001, originally considered by some to be a temporary phenomenon, would last for the long term. In order to update the original feasibility projections done by ERA in June 2001, hotel consultant Maurice Robinson recommended that the financial feasibility of the project be re-analyzed assuming a 20% drop in ERA's projected hotel room rates. With the assistance of Piper Jaffray, Robinson concluded that even with discounted room rates, the project could still be financed using the tax exempt financing described above.

On September 24, 2003, three hotel developers/operators submitted responses to the RFP. On October 14, 2003, Plaintiff and Robinson made a presentation in closed session to the ARRA Board at which the responses were discussed. The undisputed testimony is that Plaintiff's presentation went very poorly. Plaintiff himself testified that after the meeting the City staff needed to repair damage that was done at the October 2003 ARRA closed session as a result of insufficient information being presented. In an e-mail dated October 16, 2003, Plaintiff wrote to his supervisors, Base Reuse and Redevelopment Manager Debbie Potter and Development Services Director Paul Benoit, that for the upcoming meeting with Flint he would apologize for not presenting a comprehensive explanation of the tax exempt financing structure at the closed session. Plaintiff, acknowledging that he was unprepared, testified that at the time of his presentation to the ARRA Board at the October 2003 closed session, he did not know if the project was economically feasible because he had just received input from the developers three or four days before the meeting and he did not have time to analyze it. Levine Depo. 136:4-14; 137:17-138:2; Exhibit 6, 202:6-203:21

Plaintiff's supervisor, Potter, testified that the City Manager believed that new information, which had not been a part of the written staff report, was presented verbally to the

ARRA Board and was put out by Plaintiff and Robinson in a manner that had negative impacts for the project. Potter testified that the information about the hotel financing structure which was presented was not explicitly contained in the staff report distributed in advance of the meeting and was new information for the City Manager and the ARRA Board. Potter Depo. 74:17-76:11; 77:3-78:15 Shortly after the October 14, 2003 closed session, as a result of Plaintiff's presentation during the closed session and because he believed he and the ARRA Board had received critical financial information in the "11th hour," Flint directed Potter, to prepare a Performance Improvement Plan (PIP) for Plaintiff. Flint had previously used the PIP process with other employees, even at a higher level than Plaintiff. Flint Depo. 56:24-57:19; 59:8-15; 59:24-60:3; 93:15-95:1; 159:14-161:6

Plaintiff testified that he understood that the City Manager wanted to impose a PIP on him because of the way things happened in a closed session meeting of the ARRA Board. Plaintiff testified that Potter told him that she wanted his participation in drafting the PIP so he could write it the way he would want it so that it would be guaranteed to be successful and make the PIP doable and achievable so that it would not lead to any further action against him. [3] Levine Depo. 105:10-23; 118:19-119:7; 119:23-120:13; 122:23-124:1; 208:13-209:24 Potter testified that the City Manager told her that the PIP was not punitive but was being put forward as an opportunity for Plaintiff to work on aspects of his job performance. Potter took almost four months to write a draft PIP and it was never presented to Plaintiff, much less implemented, because it was being reviewed in draft form by Potter's supervisor, Benoit, when the decision was made to lay off Plaintiff. Potter Depo. 100:15-25; 102:22-103:10; 120:18-24

In December 2003, Piper Jaffray's analysis of the three responses to the RFP, showed a feasibility gap of approximately $1.5 million in annual bond service payments that the City of Alameda would need to fund. While this amount was approximately equal to the "transient

---

[3] During discovery, Plaintiff speculated that when the PIP was finished he was going to refuse to participate. Flint testified that in the situation where an employee declines to participate in a PIP, the City would then address the performance deficiencies with something probably like a verbal warning to be followed with other intermediate steps, short of termination, if the employee's performance did not improve sufficiently. Flint Depo. 129:2-14; 137:12-138:8; 140:18-141:20

occupancy tax" which the hotel would generate each year once it was built, the City of Alameda would also have to guarantee payment of any shortfalls in the debt service of a $3.0 million subordinate bond issue. Unfortunately, underwriting standards had recently changed and that indebtedness could no longer be insured for, meaning it would have to be insured by the general funds of the City of Alameda. Flint Depo., Exhibit 22, third page

On January 20, 2004, Plaintiff authored a staff report for the City Manager to send to the ARRA Board in anticipation of its February 4, 2004 closed session meeting. Levine Depo. 174:24-176:1 The memo authored by Plaintiff provided historical perspective with regard to the financial feasibility of the golf course and hotel project. The memo recounted ERA's original financial analysis, the nature of the responses to the RFQs, and the updated, post 9/11 economic feasibility analysis by Piper Jaffray and Robinson.

> Piper Jaffray's analysis, conducted in December 2003, showed a gap of approximately **$1.5 million in annual bond service payments that the City would need to fund**. This is approximately equal to the amount of transient occupancy tax that the hotel would generate for the City each year. Additionally, the City would have to guarantee payment of any shortfalls in debt service on the $3.0 million subordinate bond issue. Subordinate bonds are explained in the financing structure below. **Until recently, this guarantee could be insured for, but underwriting standards no longer allow this**.

> Although the City's cash payment and bond guarantee requirements could probably be reduced by working with the developer to reduce project costs, **an acceptable tax exempt financing package cannot be structured until room rates and occupancies return to the levels projected prior to 9/11 and the development costs are substantially reduced**. The **lack of private financing**, and the challenges of a tax-exempt deal, indicate that the hotel market is not strong enough to support a golf course/resort hotel at this time. Flint Depo. Exhibit 22, third page (Emphasis added)

Plaintiff testified that his January 2004 memo to the ARRA Board informed the Board that the golf course and hotel project was not financially feasible. Levine Depo. 46:12-48:17 The memo, authored by Plaintiff, concluded with the following recommendation:

> The Executive Director recommends that the ARRA board endorse suspension of the developer selection process with continuation of work relating to site remediation; completion of the EIR and permitting for import of dredge material; and negotiation of a tipping fee for receipt of dredge material in anticipation of a future golf course. Flint Depo. Exhibit 22, fifth page; Levine Depo. 174:24-176:1

At its February 4, 2004 closed session meeting, the ARRA Board accepted and adopted staff's recommendation. The ARRA Board directed the suspension of the developer selection

process and the suspension of the golf course and hotel project.  In addition, the ARRA Board directed that work relating to site remediation of the overall former Naval Air Station property continue.  The ARRA Board also directed completion of the Environmental Impact Report (EIR) and permitting for the import of dredge material and negotiation of a tipping fee for receipt of dredge material in anticipation of a future golf course.  Potter Depo. 179:3-14; 180:14-24

Since the golf course and hotel project was no longer going forward in the foreseeable future, on February 17, 2004, City Manager Flint sent a letter to Plaintiff informing him that he was being laid off, effective February 27, 2004, because of the ARRA's decision to indefinitely suspend development efforts on the Alameda Point golf course and hotel complex.  Flint Depo. 64:12-65:7  Flint explained that because the project was being indefinitely suspended, the ARRA would no longer be funding Plaintiff's position and because the funding was being withdrawn, his position was being eliminated.  Flint testified that he referenced funding in the layoff notice because Levine's position on the golf course and hotel project was funded from bond proceeds and when the ARRA Board suspended the project, the bond funds could no longer be used to pay Levine.  Flint Depo. 67:19-68:15[4]  The layoff notice informed Plaintiff that the City of Alameda did not currently have any other open positions or classifications for him, therefore he would be laid off.  Flint's letter explained that while he was on layoff status, his name would be placed on a preferred list for up to twelve (12) months and he would have re-employment rights on a seniority basis to future Property Development Manager positions should such positions become available during that timeframe.  Finally, Flint informed Plaintiff that if he had any questions about his layoff, he should contact Human Resources Director Karen Willis.  Willis Depo. Exhibit 11

On February 25, 2004, Plaintiff wrote to Flint.  Plaintiff's letter requested a "due process hearing by a neutral *third party* regarding the basis of your layoff decision."  Plaintiff's

---

[4]  Plaintiff was paid from restricted bond funds and could only work on eligible bond projects, When the ARRA suspended the golf course project, those funds were reassigned to other eligible bond-funded activities. Decl. of Banks ¶2 ,4.

letter stated that it was his position "that your basis for the layoff (i.e. withdrawal of funding by ARRA resulting in elimination of my position) is not factual and represents a sham and a pretext for my actual termination." Levine Depo. Exhibit 3  When Flint received the letter, he forwarded it to Human Resources Director Karen Willis and told her to make sure Plaintiff's due process opportunities were respected.  Flint Depo. 72::1-13

On February 26, 2004, Human Resources Director Karen Willis wrote to Plaintiff, indicating that his letter to the City Manager had been forwarded to her office for response. Willis responded that while she would be happy to meet with Plaintiff and listen to his concerns, there was no pretermination hearing before a *third party* available.  Willis explained that under the MOU between the City and the Plaintiff's union, MCEA, the procedures to be utilized in the event of an employee layoff had previously been bargained for.  Willis explained that a layoff is not a discharge for cause and could not be appealed under the MOU grievance procedure.  Willis copied Plaintiff's Union with her letter. Levine Depo. Exhibit 4

Plaintiff testified that he met with Willis prior to his leaving City employment.  In the meeting, Plaintiff testified that he talked to Willis about the whole matter, the layoff process and procedures and he told her that he did not think the reasons for the layoff were true. Plaintiff testified that he told Willis that the reason offered was fantasy and that something was going on with Flint.  Levine Depo. 183:14-185:4

### III.    STATEMENT OF ISSUES TO BE DECIDED

1.    Should Plaintiff's second claim for relief for age discrimination under the California Fair Employment and Housing Act (FEHA) be adjudicated in favor of individual Defendant James Flint because individual supervisors and managers are <u>not</u> personally liable for employment discrimination under FEHA.?

2.    Should Plaintiff's second claim for relief for age discrimination under the California Fair Employment and Housing Act (FEHA) be adjudicated in favor of Defendant City of Alameda because Plaintiff cannot prove the necessary elements for a claim for relief for age discrimination?

3.      Should Plaintiff's first claim for relief under 42 U.S.C. §1983 be adjudicated in favor of Defendants because Plaintiff cannot establish any underlying violation of a federal right, because Defendant Flint is entitled to qualified immunity and because Plaintiff cannot establish that there was a policy or custom in place such as to trigger liability against Defendant City of Alameda?

## IV.    LEGAL ARGUMENT

**A.      Defendants' Are Entitled To Judgment As A Matter Of Law On Each Of Plaintiff's Claims Because The Undisputed Material Facts Establish That At Least One Element Of Each Of Plaintiff's Claims Cannot Be Established Or There Is A Complete Defense**

Summary judgment is appropriate if the pleadings on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) Given the liberal rules of pleading which allow for the assertion of claims that have no evidentiary support, a motion for summary judgment "pierces" the complaint and puts the Plaintiff to the test of affirmatively coming forward with sufficient evidence for his claims. *Celotex, supra* 477 U.S. at 317; Schwarzer, Tashima & Wagstaffe, *Cal. Prac. Guide: Fed. Civ. Pro. Before Trial* (The Rutter Group 2003), §14:4.

**B.      Individual Defendant Flint Is Entitled To Judgment On Plaintiff's Second Claim For Relief For Age Discrimination Under FEHA Because Such A Claim Cannot Be Pled Against An Individual Defendant As A Matter of Law**

Plaintiff's second claim for relief for age discrimination under FEHA is against both Defendants. However, it is well-established law in California that individual supervisors and managers are <u>not</u> personally liable for employment discrimination under FEHA. *Reno v. Baird,* 18 Cal.4th 640, 663 (1998); *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55 (1996). Therefore, there is no genuine issue as to any material fact and individual Defendant Flint is entitled to a judgment as a matter of law on Plaintiff's second claim for relief for age discrimination under FEHA. Fed. R. Civ. P. 56(c)

**C.** **Defendant City Of Alameda Is Entitled To Judgment On Plaintiff's Second Claim For Relief For Age Discrimination Under FEHA Because Plaintiff Cannot Establish The Existence Of Several Elements Essential To That Claim For Relief As A Matter Of Law**

Plaintiff's second claim for relief alleges age discrimination in violation of California's Fair Employment and Housing Act (FEHA).[5] To prevail under the discriminatory discharge theory, as alleged here by Plaintiff, he must show that the City of Alameda harbored a discriminatory intent. If Plaintiff cannot produce direct evidence of the discriminatory intent, he is allowed to utilize the three-part analysis set out by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973).

Under the *McDonnell Douglas* analysis, Plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. If the Plaintiff establishes a *prima facie* case of discrimination, the City must meet its burden of production by offering legitimate, non-discriminatory reasons for its actions which rebuts the presumption raised by the *prima facie* case. Once the City does so, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. At that point, Plaintiff must prove that the City <u>intentionally discriminated</u> against him either by directly persuading the court that a discriminatory reason more likely motivated the City, or indirectly by showing that the District's proffered reasons are pretextual and unworthy of credence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254-256 (1981); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-508 (1993); *Mixon v. Fair Employment and Housing Commission,* 192 Cal.App. 3d 1306, 1317-1319 (1987); At all times, the burden of persuasion remains with the Plaintiff. *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420-21 (9th Cir. 1990); *Nidds v. Schindler Elevator Corporation,* 113 F.3d 912, 916-17 (9th Cir., 1996).

---

[5] Government Code §12940 *et seq.* Both California and Federal Courts have recognized that "while the California act and title VII differ in some particulars, their objectives are identical, and California courts have relied upon federal law to interpret analogous provisions of the state statute." *Mixon v. Fair Employment and Housing Commission,* 192 Cal.App. 3d 1306, 1316 (1987).

### 1. Plaintiff Cannot Establish A *Prima Facie* Case Of Age Discrimination

In order to establish a *prima facie* case of age discrimination in the context of a layoff, Plaintiff must prove the traditional first three prongs of the well-established *McDonnell Douglas* test: (1) he was a member of a protected class [age 40-70]; (2) he was performing his job in a satisfactory manner; and (3) he was discharged (laid off). In a layoff case such as this one, the traditional fourth prong of the *McDonnell Douglas* test is modified. Instead of having to prove that he was replaced by a substantially younger employee with equal or inferior qualifications, Plaintiff must prove through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination. *Rose v. Wells Fargo & Co.,* 902, F.2d 1417, 1421 (9th Cir. 1990); *Nidds v. Schindler Elevator Corporation,* 113 F.3d 912, 917 (9th Cir., 1996). The inference of age discrimination can be established by showing the employer had a continuing need for his skills and services in that his various duties were still being performed. *Nidds, supra,* 113 F.3d at 917, citing *Wallis v. J.R.. Simplot Co.,* 26 F.3d 885, 891 (9th Cir. 1994); *Coleman v. The Quaker Oats Company,* 232 F.3d 1271, 1281 (9th Cir. 2000). However, in a reduction-in-force case, there is no adverse inference to be drawn from an employee's discharge if his position and duties are completely eliminated. If [the discharged employee] cannot show that [his employer] had some continuing need for his skills and services in that his various duties were still being performed, then the basis of his claim collapses. *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1421 (9th Cir. 1990).

It is anticipated that Plaintiff will assert that his various duties were still being performed. The relevant, admissible evidence indicates that is not true. Plaintiff's working title was Golf Course Project Manager. At its February 4, 2004 closed session meeting, the ARRA Board accepted and adopted staff's recommendation, including Plaintiff's recommendation, to suspend the golf course and hotel project because it was not financially feasible. The ARRA Board directed the suspension of the developer selection process and the suspension of the golf course and hotel project. In addition, the ARRA Board directed that work relating to site remediation of the overall former Naval Air Station property continue. The ARRA Board also directed completion of the Environmental Impact Report (EIR) and

permitting for the import of dredge material and negotiation of a tipping fee for receipt of dredge material in anticipation of a future golf course. Any future importation of dredge materials would be contingent on the tipping fee to be negotiated. In the event an acceptable tipping fee is not negotiated, dredge materials will not be imported, making the golf course and hotel project even more unlikely to happen. Potter Depo. 179:3-14; 181:18-183:2

The undisputed evidence is that Plaintiff was never responsible for nor worked on site remediation for the formal Naval Air Station property. Plaintiff testified that he was not the lead person on issues related to environmental site remediation of the proposed golf course and hotel project site. His supervisor, Debbie Potter was the point person working with the U.S. Navy on that issue. Levine Depo. 89:5-19. Since Plaintiff's layoff, Base Reuse Planner III Elizabeth Johnson has continued to do the same site remediation work she did prior to his layoff. Potter Depo. 40:4-10; Johnson Depo. 18:18-25 The site remediation work is a global issue; it is related to the entire Alameda Point site, not just the proposed golf course site. Potter Depo. 107:2-23

Plaintiff admits that prior to his layoff, Johnson was handling the "hands on" work on the Environmental Impact Report. Levine Depo. 74:2-75:8 Plaintiff's supervisor, Potter was responsible for completion of the EIR and submission of the EIR to the ARRA for certification with Johnson being the project manager for the EIR. Johnson testified the ARRA's consultant was responsible for preparing the EIR itself and she was responsible for coordinating with the consultant. Potter Depo. 35:1-10; Johnson Depo. 9:20-25; 34:4-8; 83:4-17 Plaintiff admits that prior to his layoff, Johnson did not report to him but rather reported to his supervisor Potter. Plaintiff admits that prior to his layoff, he was only involved in the preparation of the EIR process to the extent he was needed. Prior to his layoff, Plaintiff attended meetings with the EIR consultants, which were also attended by Johnson. Levine Depo. 74:2-75:8; 76:10-25. The EIR work is the only active work going on at this time with regard to the suspended golf course and hotel project. Potter Depo. 58:6-19

It is undisputed that the ARRA may not apply for any permits required for the importing of dredge material until the EIR is certified. Levine Depo. 56:13-58:5 To date, the

EIR still has not been certified. Potter 35:11-16 The undisputed evidence is that no permits are being pursued by the ARRA at this time because there is no certified EIR. Potter Depo. 35:24-36:5 In addition, the ARRA will only proceed with the permitting process for the importation of dredge materials if an economically feasible tipping fee is eventually negotiated. Potter Depo. 58:20-25; 187:12-17 No time is being spent by any ARRA staff on dredge import activities. Since Plaintiff's layoff, there have been no negotiations with nor even efforts to explore sources of dredge materials to import. Potter Depo. 55:7-17; 193:15-194:4 Therefore, no work has been undertaken relative to the permitting for the import of dredge material since Plaintiff's layoff.

It is also undisputed that there have been no negotiations regarding tipping fees for receipt of dredge materials since Plaintiff's layoff. Potter Depo. 185:17:186:1 In fact there were not active negotiations regarding tipping fees even prior to Plaintiff's layoff. Levine Depo. 49:5-24; 51:11-18

It is anticipated that Plaintiff will argue that despite the lack of financial feasibility for the golf course and hotel project, after obtaining a certified EIR, the ARRA *could* have proceeded to get all land use permits and entitlements, obtained the dredge materials and do all of the construction and engineering work to "cap" the land with the dredge material and then wait for the rest of the project to possibly become financially feasible. However, as Plaintiff's former supervisor testified, a public agency would not take on the risk of entitling a project and the risk of spending all the up front money on a project in expectation that perhaps, in the future, a private developer would come in. The ARRA never conceptualized the project that way and Potter does not anticipate it would ever go that way. Potter Depo. 198:10-199:7; The fact the ARRA has chosen not to proceed in a financially risky and abnormal manner on the suspended project is certainly not evidence creating an inference of intentional age discrimination.

It is also undisputed that the golf course and hotel project remains financially unfeasible and, in fact, may be even less feasible now than it was in February of 2004. Potter Depo. 163:16-23 Plaintiff testified that he has no reason to belief that the project had become

financially feasible as of his deposition on October 24, 2004. In fact, on October 16, 2003, Plaintiff wrote to his supervisors that, "Assuming reasonable economic recovery the project might be financible [sic] by 2008 using tax exempt bonds." Levine Depo. Exhibit 6, 202:6-203:21

It is anticipated that Plaintiff will argue that <u>some</u> of his duties were assumed by other employees after his layoff. However, even where <u>many</u> of a plaintiff's responsibilities are eventually assumed by a younger co-worker, six or seven months after the plaintiff's layoff, that "substantially weakens" his claim. Even in that circumstance, the plaintiff must still come forward with "additional direct, circumstantial, or statistical evidence that age was a factor in his termination." *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1422 (9th Cir. 1990) There is no evidence that any duties previously performed by Plaintiff which may have been assigned to other employees constitutes any meaningful amount of work for which Plaintiff should have been retained. An employer is certainly not required to retain a full-time employee when the need for most of that employee's duties has been basically eliminated and the limited, few duties remaining can be appropriately and efficiently assigned to existing employees. It is undisputed that no new employees have been hired to assume any of Plaintiff's former duties.

It is anticipated that Plaintiff will argue that Johnson, the project manager for the EIR was changed from part-time work to full-time work after his layoff. However, Johnson was not assigned nor did she assume additional duties when she returned to full-time work (37.5 hours/week) from part-time work (20 hours/week) in September 2004. She returned to full-time work after resolution of the child care issues that had prompted her part-time schedule and because her Director did not want a part-time position in the budget. Potter Depo. 38:4-9; Johnson Depo. 7:112-8:5; 9:6-11

It is also anticipated that Plaintiff will assert that there were other duties he could have been retained to perform. However, when an employer modifies its workforce for business reasons, it has no obligation to transfer an employee to another position within its company, in this case, within the City. *Gibbs v. Consolidated Services,* 111 Cal.App.4th 794, 800 (2003), citing *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1422 (9th Cir. 1990).

It is anticipated that Plaintiff will argue he should have been retained to work on what is known as the ACET project. Plaintiff testified that following the October 2003 ARRA closed session the golf course and hotel project was, to a large extent, put on a back burner. In order to make sure that Plaintiff had work to do, Potter, who had been working on a project with a company called Advancing California's Emerging Technologies (ACET), assigned Plaintiff to work on that project in early December. Plaintiff admits that it was work Potter had been doing. Between December 2003 and Plaintiff's layoff on February 27, 2004, Plaintiff spent approximately 25% of his time on the ACET project. When Plaintiff was laid off, Potter re-assumed work on the project. Potter estimated that she spent less than 20% of her time working on that project after February 27, 2004 until August of 2004 when the project was shut down by the federal government. Levine Depo. 94:20-23; 97:4-8; 174:24-176:1; Potter Depo. 22:9-25; 23:13-24:23; 26:3-9; 29:17-20

It is anticipated that Plaintiff may assert that he should have been assigned to the job held by Stephen Proud who is the Alameda Point Project Manager. In that position, Proud is responsible for all negotiations with the U.S. Navy (which still owns the former Naval Air Station) and the master developer, Alameda Point Community Partners. Proud was hired in March 2004 to fill the vacancy created by the resignation of Doug Yount. Plaintiff testified that Yount had been his supervisor's supervisor. Yount's vacancy had been posted for recruitment since 2003. Plaintiff's argument that he should have been summarily promoted two levels and the fact that he was not is evidence of age discrimination is completely without merit. Potter Depo. 11:2—12:7; 47:4-25; Levine Depo. 41:1-42:2;

It is anticipated that Plaintiff may assert that he should have been retained to do the negotiations with the U.S. Maritime Association (MARAD) because that was work he had previously performed in his prior position as Facilities Manager. However, in 2002, as part of the privatization process, responsibility for those negotiations were assumed by the master developer, Alameda Point Community Partners. That responsibility was then assumed by Potter's former supervisor, Doug Yount. When Yount resigned, those duties were assigned to Community Development Manager Nanette Banks. The lease negotiations are now complete

with the exception of a lease for a newly constructed warehouse. Banks testified that she estimated that she spent less than 10% of her time on those lease negotiations. Banks Depo. 12:20-13:22; 14:7-18

Plaintiff cannot demonstrate a continuing need for the same services he performed as Golf Course Project Manager and therefore cannot establish a *prima facie* case of age discrimination. (1422) *Rose v. Wells Fargo & Co.,* 902 F.2d 1417 (9th Cir. 1990) In light of Plaintiff's failure to prove, by a preponderance of the evidence, a *prima facie* case of age discrimination, Defendant City of Alameda is entitled to judgment on Plaintiff's second claim for relief for age discrimination under FEHA.

### 2. The City Had Legitimate, Non-Discriminatory Reasons For Laying Plaintiff Off

Even if Plaintiff could prove a *prima facie* case of age discrimination, Defendant City's legitimate, non-discriminatory reason for its employment decision concerning Plaintiff provide a complete defense. *Caldwell v. Paramount Unified School District,* 41 Cal. 4th 189, 203 (1995) It is undisputed that the golf course and hotel project was not financially feasible and was suspended by the ARRA Board on February 4, 2004. It is undisputed that Plaintiff was the Golf Course Project Manager. It is undisputed that Plaintiff was laid off because of the suspension of the golf course and hotel project. It is undisputed that the ARRA Board withdrew the funding for Plaintiff's position when it suspended the golf course and hotel project. This undisputed evidence satisfies Defendant City of Alameda's burden of production by offering legitimate, non-discriminatory reasons for its actions and rebuts the presumption raised by any *prima facie* case.

### 3. Even If Plaintiff Could Succeed In Establishing A *Prima Facie* Case Of Age Discrimination, He Has No Specific and Substantial Evidence Sufficient To Prove That The Reason For His Layoff Was A Pretext For Intentional Age Discrimination

The establishment of a *prima facie* case based on the minimum evidence necessary to raise a presumption of discrimination does not preclude summary judgment. A plaintiff cannot defeat summary judgment simply by making out a *prima facie* case. In response to an employer's offer of nondiscriminatory reasons, a plaintiff must produce **specific, substantial**

**evidence of pretext**. *Coleman v. The Quaker Oats Company,* 232 F.3d 1271, 1282, citing *Wallis v. J.R.. Simplot Co.,* 26 F.3d 885, 890-91 (9th Cir. 1994). Plaintiff must show either that the **stated reason for the layoff was false** or that the **true reason for the layoff was age discrimination.** *Nidds, supra* 113 F.3d at 918; *Coleman, supra* 232 F.3d at 1288; *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (emphasis added).

"It is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were [un]sound, unreasonable or poorly considered." *Hersant v. California Department of Social Services*, 57 Cal. App. 4th 997, 1005 (1997) If the reasons for the adverse employment action are non-discriminatory, they need not be wise or correct. *Guz v. Bechtel National, Inc.,* 24 Cal.4th 317, 358 (2000) Instead, on summary judgment, the plaintiff must submit substantial evidence that the employer's reasons are **"implausible, inconsistent or baseless**." *Id.* A triable issue about the appropriateness of the adverse action are not "alone sufficient to establish the fact of discrimination or are alone sufficient to avoid summary adjudication." *Id.* Rather, the plaintiff must prove by a preponderance of the evidence that there was **a causal connection** between the employee's protected status and the adverse employment decision." *Clark v. Claremont University Center,* 6 Cal. App.4th 639, 664. The ultimate issue is whether the employer acted with a motive to illegally discriminate. *Guz, supra* 24 Cal.4th at 358.

As a matter of law, even if Plaintiff could establish a *prima facie* case of age discrimination, Plaintiff's burden to show pretext is especially steep because he would need to rebut the strong "same-actor" inference that a court must take into consideration on summary judgment. *Coghlan v. American Seafoods Company LLC,* 2005 U.S.App. LEXIS 13459, 13 and 21, (9th Cir. 2005). The "same actor inference" arises where, as here, Defendant Flint, who Plaintiff now alleges discriminated against him because of his age, was the same person who made the decision to hire Plaintiff as the Golf Course Project Manager rather than laying him off from his prior job as Facilities Manager.

In *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, (9th Cir. 1996), we held that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong

inference arises that there was no discriminatory action" *Id. at 270-71"* . . . We based our holding in *Bradley* on the principle that an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs. *Coghlan, supra* 2005 U.S.App. LEXIS 13459 at 13-14.

California courts have adopted the "same actor inference for FEHA cases. In *Horn v. Cushman & Wakefield Western, Inc.* 72 Cal.App.4th 798, 809 (1999), the court held,

As observed by the Fourth Circuit: "One is quickly drawn to the realization that 'claims that employer animus exists in termination but not in hiring seem irrational.' From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.' " *Proud v. Stone, supra*, 945 F.2d 796, 797.

In mid-2002, Plaintiff was facing imminent layoff because the ARRA had privatized the leasing and property management function he was performing. Instead of laying off Plaintiff, Flint hired him as the Golf Course Project Manager, the position from which he was laid off in February 2004. Flint Depo. 77:4-6; Potter Depo. 64:10-65:2; 84:24-86:5 While Plaintiff may argue that the almost two year time span is not a "short period of time," both *Coghlan* and *Horn,* applied the "same actor inference" to grant employers summary judgment in cases dealing with even longer periods of time. In *Coghlan,* the court rejected plaintiff's argument that 3 years was too long a period of time. In *Horn,* the court found five years "is a relatively short time and is not so long a time as to attenuate the presumption." *Horn, supra* 72 Cal.App.4th at 809, n.7.

Where the "same actor inference" is established, the plaintiff's burden to present "specific and substantial" evidence to defeat an employer's motion for summary judgment is especially steep. *Coghlan, supra* 2005 U.S.App. LEXIS at 12-13. Like the plaintiffs in *Coghlan* and *Horn*, Plaintiff is unable to present "specific and substantial" evidence that the reason for his layoff was a pretext for intentional age discrimination.

Plaintiff testified that he, himself, does not know if he believes that he would not have been laid off if he were younger. Levine Depo. 169:19-170:21. In fact, at his deposition, Plaintiff testified that he believed there were a host of reasons why Flint laid him off. Plaintiff testified that he believes that Flint made the decision to lay him off because of a number of incidents over the years involving Plaintiff's job performance with which Flint was unhappy

and because Flint was not particularly fond of Plaintiff. Plaintiff testified that he thinks Flint was extremely angry about the October 2003 ARRA closed session and that was the single thing that focused Flint on other things about Plaintiff that had irritated Flint over time. Plaintiff testified that those things were Flint's perception of Plaintiff's performance or lack of performance, Flint's perception that Plaintiff was the "rich guy from Marin," and Flint's perception that Plaintiff was one of the "old guys" who had been on staff when Flint joined the City. Plaintiff testified that he also believed those things included Flint's perception that Plaintiff was not being sufficiently attentive to Flint's stories about soccer and other things and that Flint did not like Plaintiff because Plaintiff has a different style or personality. Levine Depo. 165:23-167:2

Obviously, of the myriad of reasons why Plaintiff believes Flint made the decision to lay him off, the only ones minimally and arguably relevant to this case would be ones related to Plaintiff's age. Plaintiff testified that on at least two occasions, Flint referred to himself and/or to Plaintiff as the "old guys" or the "old guy." Plaintiff does not remember the date of each occasion, but it might have been in 1998 or 1999, when, for five months, he was temporarily reporting directly to Flint after his former supervisor has left and before his new supervisor started. Levine Depo. 148:19-153:7; 44:15-45:5. Plaintiff testified that one occasion was in approximately 2000, when Flint asked him how old he was. Plaintiff testified that it appeared that Flint was surprised that Plaintiff was five years older than Flint. Plaintiff testified that the question was in the context of a discussion of Flint's retirement plans and Flint realizing that Plaintiff was the age that Flint wanted to be when he retired. Levine Depo. 152:22-153:7; 156:10-157:10.

Plaintiff's testimony is legally insufficient to prove animus based on age. First of all, it was the ARRA Board which, based on Plaintiff's and other staff member's recommendation, to suspend the golf course and hotel project. Flint's decision to lay Plaintiff off was a patently obvious and reasonable decision, i.e. the project is suspended, lay off the project manager. Therefore, alleged comments by Flint are not relevant to a decision made by the ARRA Board.

However, even with regard to Flint, Plaintiff's testimony is insufficient to raise a genuine issue of material fact as to age discrimination. In *Nidds v. Schindler Elevator Corporation,* 113 F.3d 912, 918-19 (9th Cir. 1996), the plaintiff alleged that a supervisor told another employee that he intended to get rid of all the "old timers" because they would not "kiss my ass." The Ninth Circuit stated that even with that comment, there was insufficient evidence to raise a genuine issue of fact as to whether the actual reason for plaintiff's layoff was age discrimination. The *Nidds* court found the comment to be like the comment about "grey hair" in *Nesbit v Pepsico, Inc.,* 994, F.2d 703, 705, (9th Cir. 1993) in which the court held that the comment had been uttered in an ambivalent manner and was not tied directly to the plaintiff's termination. See also *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1423 (9th Cir. 1990) [employer's use of the phrase "old-boy network" did not support inference of discriminatory motive]. Here, at best Flint's alleged comments were ambivalent, significantly removed time-wise from Plaintiff's layoff and not tied, directly or even indirectly to Plaintiff's layoff. In addition, the alleged comments occurred prior to when Flint made an employment decision favorable to Plaintiff, hiring him as Golf Course Project Manager in lieu of laying him off.

Plaintiff cannot establish, with specific and substantial evidence, either that the stated reason for his layoff was false or that the true reason for his layoff was age discrimination. Therefore, there is no genuine issue as to any material fact and Defendant City of Alameda is entitled to a judgment as a matter of law on Plaintiff's second claim for relief for age discrimination under FEHA. Fed. R. Civ. P. 56(c)

**D.    Defendants Are Entitled To Judgment On Plaintiff's First Claim For Relief For Deprivation Of Due Process Under 42 USC §1983 Because Plaintiff Cannot Establish Any Underlying Violation Of A Federal Right, Because Defendant Flint Is Entitled To Qualified Immunity And Because Plaintiff Cannot Establish That There Was A Policy Or Custom In Place Such As To Trigger Liability Against Defendant City of Alameda**

**1.    Plaintiff Cannot Establish Any Deprivation Of Due Process**

A public employee with a property interest in his employment may not be laid off without prior notice and an opportunity to respond. *Clements v. Airport Authority,* 69 F.3d

321 (9th Cir. 1995). "Although the pre-termination hearing need not be elaborate, 'some kind of hearing' must be afforded the employee prior to termination. The essential requirements of this pre-termination process are *notice* and *an opportunity to respond.*" *Clements, supra* 69 F.3d at 331-322. In *Clements,* the court found that one plaintiff had not gotten notice that her particular position would be eliminated and that she did not have the opportunity to respond and make arguments about her layoff. In the present case, Plaintiff received notice of his upcoming layoff and he had to opportunity to and he did respond.

Here Plaintiff testified that he received advance written notice of his layoff from the City Manager and the layoff notice told him the reasons for the layoff. Levine Depo. 177:16-20; 180:14-20;    The February 17, 2004 layoff notice stated that the reason for the layoff was the ARRA's recent action to indefinitely suspend development efforts on the golf course and hotel project and that ARRA would no longer be funding his position. Willis Depo. Exhibit 11

Plaintiff testified that he wrote a letter to Flint, dated February 25, 2004, stating his objection to the layoff; namely, that the "basis for the layoff (i.e. withdrawal of funding by ARRA resulting in elimination of my position) is not factual and represents a sham and a pretext for my actual termination." (Notably, Plaintiff did not assert age discrimination.) Levine Depo. 180:21-181:3; Exhibit 3  Plaintiff stated that he was entitled to a due process hearing by a neutral "*third party*" regarding the basis of your layoff decision. Plaintiff testified that when he stated in his February 25, 2004 letter to then-City Manager Flint that he wanted a pre-termination hearing, a "due process hearing by a neutral third party," he was asking for a hearing before a person who was not associated in any way with the City of Alameda. Plaintiff testified that when he stated he wanted a "neutral third party," he meant someone outside the City of Alameda. Levine Depo. 177:21-179:19

On February 26, 2004, Human Resources Director Karen Willis responded that she would be happy to meet with him and listen to his concerns. However, Willis informed Plaintiff that in the context of a layoff, there was no right to a pertermination hearing before a neutral *third party*. Willis informed Plaintiff that the City and his union, MCEA had previously

bargained for the procedures to be utilized in the event of an employee layoff, and those procedures are set forth in the MCEA MOU under Section 20.  Levine Depo Exhibit 4

Plaintiff testified that he received the letter from Willis, dated, February 26, 2004. Plaintiff testified that Willis' letter offered to meet with him and listen to the concerns he had raised in his February 25, 2004 letter to the City Manager.  Levine Depo. 182:17-183:13 Plaintiff testified that he met with Willis prior to his leaving City employment.  In the meeting, Plaintiff testified that he talked to Willis about the whole matter, the layoff process and procedures and he told her that he did not think the reasons for the layoff were true.  Plaintiff testified that he told Willis that the reason offered was fantasy and that something was going on with Flint.  Levine Depo. 183:14-185:4  Thus, having received *notice* of and *an opportunity to respond* to his layoff, Plainitff was provided his due process.  *Clements, supra* 69 F.3d at 331-322.

It is anticipated that Plaintiff will argue that the City of Alameda was obligated to provide him with a pre-termination hearing before a *third party* outside of the City of Alameda and will rely on the Second Circuit Court of Appeals case of *Dwyer v. Regan,* 777 F.2d 825 (2nd Cir. 1985)  In *Dwyer,* a public employee with a property interest in his employment was laid off based on a claimed fiscal crisis and alleged a claim under 42 U.S.C. §1983.  The plaintiff alleged that the person making the layoff decision had developed a personal dislike for him; had reassigned his geographical work location away from his wife and children's residence and, when plaintiff did not quit as a result of that reassignment, decided to lay him off based on a claimed fiscal crisis.  The court held that the district court incorrectly dismissed the entire complaint under Rule 12(b)(6) based on the Eleventh Amendment.  The court ruled that plaintiff's due process claim was not barred by the Eleventh Amendment and remanded the case stating that it was not persuaded that the complaint sufficiently alleged all facts prerequisite to a successful claim for denial of a pretermination hearing because plaintiff had not alleged that he had requested one.  *Dwyer, supra* 777 F.2d at 828-29, 833.

Then, in what is clearly *dicta*, the court stated that where the state lays off employees for fiscal reasons by abolishing or consolidating positions, no pre-termination hearings are

required. The court stated that where there is <u>no</u> indication that the state had undertaken a layoff for such fiscal reasons but there is evidence that a single employee was targeted for layoff for personal reasons, the state has an obligation to provide a pretermination hearing. "Further, we think that, in the latter circumstances due process requires that the pretermination hearing, assuming one has been requested, be held before a fact-finder other than the agency undertaking the challenged action." The court concluded that while an employer is "somewhat neutral" when terminating an employee for misconduct, an employer laying off an employee for financial reasons is "insufficiently neutral." *Dwyer, supra* 777 F.2d at 833.

This Court should decline to rely on the *dicta* in *Dwyer* because it is just that. In addition, the *dicta* in *Dwyer* is contrary to the well-established legal principles for neutrality in due process hearings, even post-termination due process hearings. In *Burrell v. City of Los Angeles,* 209 Cal.App.3d 568 (1989), two Los Angeles city employees challenged the constitutionality of a city charter provision which only allowed the Los Angeles Civil Service Board to reduce an employee's disciplinary penalty in connection with his post-termination appeal if the same official who originally imposed the disciplinary action consented to the penalty reduction. The court reviewed both U.S. and California case law regarding post-termination due process hearings.

The court found that under federal constitutional law, "the right to a fair and impartial tribunal is not violated by permitting the official who makes the initial disciplinary decision to have the final say in the matter." *Burrell, supra,* 209 Cal.App.3d at 579. Under federal constitutional law, absent a showing of either personal animosity or financial interest in the outcome of the decision, no due process rights are violated where an advisory opinion is rejected by the final decision-maker even if the final decision-maker is the person who made the initial disciplinary decision. *Burrell, supra,* 209 Cal.App.3d at 579-581. The court found that the California law was in accord with federal law and that mere involvement in an ongoing disciplinary proceeding does not preclude an individual from making the final appeal decision. Due process is only violated if the reviewer is demonstrably biased or has a personal or financial interest strongly suggesting a lack of impartiality. An appearance of bias is not

enough to violate due process and a system which permits a city council, which originally dismissed an employee to make an ultimate decision overruling a civil service commission's findings and recommendations does not violate due process. *Burrell, supra,* 209 Cal.App.3d at 581-585, citing *Mennig v. City Council,* 86 Cal.App.3d 341 (1978).

In the present case, Plaintiff was provided advance notice of his layoff as well as the reason for his layoff. He was provided with the opportunity to and he did respond to Human Resources Director Karen Willis. There is no evidence in the record upon which to conclude that Willis was not neutral. There is no evidence in the record showing either personal animosity nor financial interest in the outcome. In fact, Willis did not make the original decision and, as Human Resources Director, has the experience and expertise to analyze challenges to a layoff decision.

The *dicta* in *Dwyer* should not be persuasive to this Court. U.S. and California case law is clear that the due process right to a fair and impartial post-termination hearing is not violated by permitting the official who makes the initial disciplinary decision to have the final say in the matter, whether that official be the top administrator or the governing body. *Dwyer* contradicts cases before it and cases after it on the illogical, unsupported assertion that an employing agency is going to be more neutral when reviewing a termination for misconduct rather than a layoff for reorganization or fiscal reasons.

Plaintiff, as a laid off public employee, also makes reference in his Complaint to a denial of a "post-termination" hearing. However, *Plaintiff never requested a post-termination due process hearing.* In order to create an issue of whether or not he is entitled to a post-layoff due process hearing, Plaintiff must request such a hearing and Plaintiff did not. *Perry v. Sindermann,* 408 U.S. 593, 603 (proof of property interest would obligate employer to "grant a hearing at [plaintiff's] request"). Even *Dwyer* recognized that, "if Dwyer made no request for either a pretermination hearing or an administrative posttermination hearing, the complaint should be dismissed." *Dwyer, supra,* 777 F.2d at 834-35.

However, even if Plaintiff had requested a post-termination due process hearing regarding his layoff, instructive on what would have been required in the absence of any cases

on point is *Coleman v. Department of Personnel Administration,* 52 Cal.3d 1102 (1991). *Coleman* addressed the question of what post termination due process is required to be given to a public employee who has been determined to have resigned under the AWOL provision applicable to State of California employees versus an employee who is terminated for cause. The California Supreme Court held,

> For the reasons discussed above, we conclude that before the state can treat a permanent or tenured employee's unexcused absence for five consecutive working days as a constructive resignation under the AWOL statute, it must give the employee written notice of the action contemplated. The notice must advise the employee of the facts supporting the state's invocation of the AWOL statute. If the employee challenges the accuracy of the state's factual basis, the state must, as soon as practicable, give the employee an opportunity to present his or her version of the facts. To assure "the appearance and reality of fairness" in the decisionmaking process ( *Marshall v. Jerrico, supra, 446 U.S. 238, 242 [64 L.Ed.2d 182, 188])* and to protect against a potential misuse of the AWOL statute, such an informal hearing must be before a neutral fact finder. Once the state has provided notice and an opportunity to respond, neither the federal nor the state Constitution requires anything more.
> *Coleman, supra* 52 Cal.3d at 1122-1123

A significant portion of the court's decision turned on the differences between the stigma associated with a termination for cause and an automatic resignation as well as the differences in the reemployment rights between the two. An employee terminated for cause is disqualified for future employment and an employee who has resigned can be reinstated. *Coleman, supra* 52 Cal.3d at 1119-1121. Applying the holding and analysis of *Coleman* to the present case, an employee who is laid off faces even less stigma than an employee who has resigned and under the collective bargaining agreement between the City of Alameda and the Management and Confidential Employees Association (MCEA), possesses preferential rights to reemployment over those of an employee who resigns. As such, an employee laid off from employment is certainly due no more, but is probably due less process than an employee deemed to have resigned under an AWOL rule.

### 2. Defendant Flint Is Entitled To Qualified Immunity

Defendant Flint is entitled to qualified immunity where the evidence establishes that he did not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). A public official

is entitled to immunity when his or her conduct is objectively reasonable as measured by reference to law clearly established at the time of the incident in question. *Maraziti v. First Interstate Bank,* 953 F.2d. 520, 523 (1992). For the reasons addressed above, the singular *Dwyer* case from the 10th Circuit could not reasonably be viewed as "clearly established law" in the face of the rest of federal and California law on due process rights of employees facing lay off. Therefore, Defendant James Flint is entitled to qualified immunity.

###   3.   Plaintiff Has Not Proven The Existence Of A Policy or Custom Of Denying Due Process To Employees Facing Layoff And Thus Cannot Establish Liability Against Defendant City Of Alameda

In order to find §1983 liability against Defendant City, Plaintiff must plead and prove the existence of a policy, regulation, ordinance or decision officially adopted by the entity's officers denying employees due process in connection with their layoff. There is no "respondeat superior" liability under §1983. *Monell v. Department of Social Services,* 436 U.S. 658, 691 (1978); *Kreutzer v. County of San Deigo,* 153 Cal.App.3d 62, 20 (1984).

Plaintiff has done neither and he cannot prove a claim under §1983 against Defendant City of Alameda. For the foregoing reasons, Defendants are entitled to judgment on Plaintiff's first claim for relief under 42 U.S.C. §1983 as a matter of law.

## V.   CONCLUSION

Based on the foregoing points and authorities, Defendants respectfully request the Court grant their motion for summary judgment and dismiss Plaintiff's Complaint in its entirety.

Dated: July 15, 2005                    Respectfully submitted,


By:

_____/S/_____
                    Linda A. Tripoli
        Attorney for Defendants CITY OF ALAMEDA and
                        JAMES FLINT