LINDA A. TRIPOLI (SBN 100389)
Attorney at Law
One Blackfield Drive, No. 403
Tiburon, California 94920
Telephone: (415) 380-8822
Facsimile: (415) 380-8868

Attorney for Defendants
CITY OF ALAMEDA and JAMES FLINT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| EDWARD LEVINE<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF ALAMEDA, a California Charter City, and JAMES M. FLINT, both individually and as City Manager for the City of Alameda,<br><br>    Defendants. | Case No. C04-01780 CRB/ADR<br><br>**SECOND SUPPLEMENTAL DECLARATION OF LINDA A. TRIPOLI IN SUPPORT OF DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EVIDENCE PRODUCED IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br>**[Fed. R. Civ. P. 56]**<br><br>Date:    September 9, 2005<br>Time:    10:00 a.m.<br>Ctrm.:    8 (19th Floor)<br><br>Trial Date: None |

I, LINDA A. TRIPOLI, hereby declare as follows:

1.    I am the attorney of record for Defendants in this action.

2.    Attached hereto as Exhibit 1 are true and correct excerpts from the deposition of Grace Sagun Harley taken in connection with this action.

3.    Attached hereto as Exhibit 2 are true and correct excerpts from the deposition of Nanette Banks taken in connection with this action.

SECOND SUPP. DECL. OF LINDA A. TRIPOLI IN SUPPORT OF DEFS.' OBJECTIONS TO
PLAINTIFF'S EVIDENCE PRODUCED IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
Levine v. City of Alameda and Flint
Case No. C-04-01780 CRB/ADR    -1-

1    I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd

2    day of September, 2005 at Tiburon, California.

3

4                                                         /S/
                                                    LINDA TRIPOLI

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

EDWARD LEVINE,

     Plaintiff,

vs.                        No. C04-01780 CRB/ADR

CITY OF ALAMEDA, A
CALIFORNIA CHARTER CITY,
AND JAMES M. FLINT, BOTH
INDIVIDUALLY AND AS CITY
MANAGER FOR THE CITY OF
ALAMEDA,

     Defendants.

_____/


DEPOSITION OF GRACE ILAS SAGUN HARLEY

VOLUME II (Pages 19 - 169)



Taken before JEANNIE M. CHIMPKY

CSR No. 12742

June 29, 2005

One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580   Fax 510/451-3797

Aiken AND Welch

Certified Shorthand Reporters

1    meaning you --

2            MR. CARNAGEY:  I think she said "we were."

3            THE WITNESS:  Because I know this has to be a

4    conversation she had with Teri Highsmith.

5            MS. TRIPOLI:  Ms. Harley, I'm going to ask you

6    or remind you:  I've already informed you that in terms

7    of conversations and discussions --

8            THE WITNESS:  With --

9            MS. TRIPOLI:  -- that you're not authorized to

10   talk about that.  So as soon as you realize this was a

11   conversation, as you allege, with Ms. Highsmith, you

12   need to let Mr. Carnagey and I know that because of the

13   City's objection to you waiving the privilege.

14           So if what you're saying is that this document

15   relates to a meeting or a conversation with

16   Ms. Highsmith, then you need to not testify about it

17   and we need to unnumber the document because it's the

18   same attorney-client privilege objection.

19   BY MR. CARNAGEY:

20       Q.  Let me ask you a question:  Do you know where

21   Ms. Banks got this document, when she generated it?

22       A.  2003, late 2003.

23       Q.  Do you know where she was when she wrote this

24   document?

25       A.  Most likely in her office.

1      Q.  Why do you say that you think Ms. Highsmith may

2  have been present?

3      A.  I didn't say "present."  I said it "could have

4  been," because I know we were talking about

5  Teri Highsmith.  She might not have been.  I'm just

6  saying I'm thinking she could have written this down

7  with a conversation, but I'm not sure.

8          MS. TRIPOLI:  Given that there's that

9  possibility, until and when Ms. Banks testifies at

10  whatever point about the notes, then because you're not

11  certain, I need to caution you about not testifying

12  about what is in the notes or your discussions with

13  Ms. Banks because you've raised the possibility that it

14  was in connection with an attorney-client privileged --

15          MR. CARNAGEY:  She speculated it was part of

16  attorney-client.  She doesn't know.  And Ms. Banks is

17  sitting here.  So I suggest you find out from Ms. Banks

18  right now so we don't have to -- I'm going to pursue

19  this further unless she tells me that she knows this

20  was generated in some kind of attorney-client process

21  or meeting.  I'm not going to put it off.  Let's deal

22  with it right now, and you can ask Ms. Banks and make a

23  representation on the record.

24          MS. TRIPOLI:  The problem, Roger, is that, as

25  with a lot of this witness's testimony, I've kind of

1  made a note every time there's "probablys," "maybes,"

2  "would guess," that there's no certainty to her

3  testimony about this meeting.  It might have been this;

4  it might have been that.  It might have been now; it

5  might have been then.  It might have been with

6  Teri Highsmith; it might not have been.

7  Unless she is certain that it did not involve

8  meetings with Teri Highsmith or conversations about

9  discussions with Teri Highsmith, then the

10  attorney-client privilege issue is present and the City

11  would object to her testifying about that.

12  MR. CARNAGEY:  Why don't we do this:  You

13  object on the basis of attorney-client privilege and

14  I'm going to ask questions on the document because you

15  can't establish attorney-client privilege right now.

16  And you can object if I try to introduce it at trial on

17  the grounds of privilege.  I'll agree that you're not

18  waiving the privilege.

19  MS. TRIPOLI:  The problem is that this witness

20  has no definitive recall about the document.

21  MR. CARNAGEY:  She does.  She said she received

22  it in a meeting.  She doesn't have a date, but she has

23  an idea when she got it.

24  MS. TRIPOLI:  And it might have been in a

25  meeting involving discussions relative to

1    Teri Highsmith.

2         MR. CARNAGEY:  She did not say she received

3    this in any meeting involving Ms. Highsmith.  She said

4    she thought Ms. Banks might have generated it somehow

5    in a conversation related to Ms. Highsmith.  That's

6    speculative.

7         And you know as well as I do that you can check

8    with Ms. Banks right now and find out where the

9    document was generated.  And if you want to represent

10   on the record that she told you that it was generated

11   in some kind of discussion she had with Teri Highsmith,

12   then preserve your record.  But I'm not going to let it

13   hang because we have a Summary Judgment Motion coming

14   up.  That's why Ms. Sagun Harley is here.  So how do

15   you want to handle it?  I'm not going to let it hang.

16        MS. TRIPOLI:  Let me talk to Ms. Banks and

17   we'll see how we proceed.

18        (Brief recess taken.)

19        MS. TRIPOLI:  In an off-the-record conversation

20   with Ms. Banks, she's indicated to me that these notes

21   were generated at two different points in time; and in

22   dispute is the right or the proper appropriateness of

23   Ms. Sagun Harley having a copy of these notes.  That is

24   very much in dispute.  However, the bottom half of the

25   page does reflect notes of conversation that Ms. Banks

1   had with Ms. Highsmith.

2          MR. CARNAGEY:  Okay.  But not the top half?

3          MS. TRIPOLI:  Not the top half.  But they were

4   written at two different times.

5          MR. CARNAGEY:  So what I want to understand is:

6   Are these actually notes that were made during a

7   conversation with Ms. Highsmith, or is this something

8   she wrote down later after the conversation with

9   Ms. Highsmith?

10         MS. TRIPOLI:  My understanding is they are

11  notes written during the conversation with

12  Ms. Highsmith.  For that reason, I would -- as we did

13  with the other document -- request that it be unmarked.

14  And we need to make it the subject of meet and confer,

15  which we can do that.

16         And I would again direct Ms. Sagun Harley that

17  to the extent she discussed the bottom half of the

18  notes with Ms. Banks, that it reflects attorney-client

19  privilege information and she's not authorized to

20  testify about it.

21         MR. CARNAGEY:  Well, let's take a lunch break

22  and I'll think about this.  When we come back, I'll

23  have some proposal -- maybe yours, maybe something

24  different.

25         But I can tell you right now on the record, I'm

1  going to want to take another hour of deposition of

2  Ms. Banks about the document. Because when I asked --

3  When plaintiff made a request for production of

4  documents, I asked for all documents pertaining to his

5  employment with the City. Basically, that's what we

6  asked for. This document wasn't contained in any

7  privileged log, and it wasn't disclosed.

8       MS. TRIPOLI: That's correct. Because to my

9  understanding, the first time the document was -- there

10  was a recollection about the document was when

11  Ms. Sagun Harley produced it.

12       As I said, there was great dispute about

13  Ms. Sagun Harley's possession of this document, but it

14  was one that was not recalled. But it was also one,

15  even if it had been located, that would not have been

16  produced because it reflects attorney-client privileged

17  communication.

18       MR. CARNAGEY: We would have at least had a

19  notation of it and been able to resolve it prior to the

20  deposition. Just for the record; just making a record.

21       Let's take a lunch break.

22       (Recess taken.)

23       MR. CARNAGEY: In an off-the-record discussion

24  with Ms. Tripoli and with respect to Exhibit 38 and the

25  claim of attorney-client privilege, I proposed that we

1   proceed as follows:  That we agree that I can ask
2   questions on the document to Ms. Sagun Harley; that
3   those questions and the document itself would be marked
4   by the court reporter as confidential and subject to a
5   claim of privilege; and that we would take the matter
6   up with the judge in conjunction with the upcoming
7   motions for summary judgment.
8          Ms. Tripoli advised me that she is not
9   agreeable to that procedure because she does not
10  believe that the city attorney's office would agree to
11  that procedure.  Is that correct?
12         MS. TRIPOLI:  That is correct.
13         MR. CARNAGEY:  So I gather, Linda, that if I
14  ask questions of the witness on Exhibit 38, that she's
15  going to be subjecting herself to a claim of breach of
16  the attorney-client privilege, as you've explained it
17  on the record?
18         MS. TRIPOLI:  Exactly.  And it's also the
19  outstanding issue of how she obtained the document
20  itself.
21  BY MR. CARNAGEY:
22      Q.  Are you ready, Ms. Sagun Harley?
23      A.  Um-hmm, yes.
24      Q.  Aside from the document that I showed you
25  earlier, Exhibit 38, which we've just discussed, do you

1 | STATE OF CALIFORNIA     )

2 | )

3 | COUNTY OF ALAMEDA      )

4

5      I, JEANNIE M. CHIMPKY, do hereby certify:

6      That GRACE ILAS SAGUN HARLEY, in the foregoing

7 deposition named, was present and by me sworn as a

8 witness in the above-entitled action at the time and

9 place therein specified;

10      That said deposition was taken before me at

11 said time and place, and was taken down in shorthand by

12 me, a Certified Shorthand Reporter of the State of

13 California, and was thereafter transcribed into

14 typewriting, and that the foregoing transcript

15 constitutes a full, true and correct report of said

16 deposition and of the proceedings that took place;

17      IN WITNESS WHEREOF, I have hereunder subscribed

18 my hand this 14th day of July 2005.

19

20

21

22

23      *Jeannie Chimpky*

24 /JEANNIE M. CHIMPKY, /CSR/No. 12742
     State of California

25

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT

---oOo---

EDWARD LEVINE,

     Plaintiff,

vs.                     No. C04-01780 CRB/ADR

CITY OF ALAMEDA, A CALIFORNIA
CHARTER CITY, AND JAMES M.
FLINT, BOTH INDIVIDUALLY AND
AS CITY MANAGER FOR THE CITY
OF ALAMEDA,

     Defendants.

_____/

COPY

DEPOSITION OF NANETTE BANKS

VOLUME II (Pages 63 - 113)

Taken before JEANNIE M. CHIMPKY

CSR No. 12742

July 26, 2005

One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580   Fax 510/451-3797

Aiken
AND
Welch

Certified Shorthand Reporters

1    A.  That is a conversation that I had with our HR

2   department regarding some forms from one division that

3   were supposed to be submitted before the fiscal year

4   and had not been submitted yet.  So that would have

5   been before June 2003.

6    Q.  What would have been before June --

7    A.  When the forms were due.

8    Q.  And is this a telephone conversation you had

9   with someone in HR?

10    A.  Yes.  These represent my notes during a

11   conversation.

12    Q.  With --

13    A.  The entire document.

14    Q.  And these are conversations you had at three

15   different times; correct?

16    A.  Correct, with two different people.  The top

17   half above the line was with Jill Kovacs in the HR

18   department.  The bottom half was with the city

19   attorney's office.

20    Q.  And it's your testimony that you made these

21   specific notes on the bottom half of this exhibit

22   during a conversation with the city attorney's office?

23    A.  Yes.

24    Q.  Anyone other than the city attorney involved in

25   that conversation?

1     A. No.

2     Q. Is this a telephone conversation?

3     A. Yes.

4     Q. When did it occur? You apparently had two

5 telephone conversations?

6     A. Yes. I believe they were the same day,

7 February -- early February 2004.

8     Q. For what purpose were you having this

9 conversation with the city attorney?

10    A. It was when I had learned that they were going

11 to lay off Ed and I asked about the mechanics of how

12 that was going to work, how that worked.

13    Q. Do you remember when in February you had the

14 first conversation?

15    A. I do not.

16    Q. Do you remember when in February you had the

17 second conversation?

18    A. I don't. I do believe, however, that they were

19 on the same day. Because reading the bullet points, I

20 think I had more questions and so I had a second

21 conversation.

22    Q. And what was it about the bullet points that

23 makes you believe you had a second conversation

24 regarding the bottom half of Exhibit 38?

25      MS. TRIPOLI: Without going into the substance,

1      A.  Okay.  Sure, yes.

2      Q.  Now, when you generate a memo like this, do you

3  generate handwritten notes like this during most of

4  your telephone conversations that you have regarding

5  personnel matters?

6      A.  This is not a memo.  I write notes when I talk

7  on the phone, yes.

8      Q.  Do you date them normally?

9      A.  No, not particularly.

10      Q.  Do you make a note of who you were talking to

11  when you generate the note?

12      A.  Sometimes.  It's not consistent.

13      Q.  When you were generating this note, were you

14  advised that you were going to be involved in the

15  procedures of Mr. Levine's layoff implementation?

16          MS. TRIPOLI:  Other than what the city

17  attorney's office may have said to her from a source

18  other than from the city attorney's office?

19          MR. CARNAGEY:  Let me phrase it a different

20  way.

21  BY MR. CARNAGEY:

22      Q.  Is it your understanding that the reason you

23  were provided this information was in order to assist

24  in the implementation of Mr. Levine's layoff?

25      A.  Can you ask that again.  I'm sorry.

1        MR. CARNAGEY:  Could you read that back.

2        (Record read.)

3        THE WITNESS:  Yes.

4   BY MR. CARNAGEY:

5       Q.  On what basis did you form that understanding?

6        MS. TRIPOLI:  Excluding what the city

7   attorney's office may have said to you in that regard.

8        MR. CARNAGEY:  The substance of it.  You can

9   say you formed the understanding based on what you were

10  told without telling me what was told.

11       THE WITNESS:  That's the answer:  based on what

12  I was told.

13  BY MR. CARNAGEY:

14      Q.  By?

15      A.  By the city attorney's office.

16      Q.  In fact, after you spoke with the city

17  attorney, you took action to -- on these various items

18  to actually implement the layoff procedures that you

19  were responsible for for Mr. Levine; correct?

20      A.  Yes.

21      Q.  Do you have the original of this memo?

22      A.  No.

23      Q.  Do you know where the original is?

24      A.  No.

25      Q.  Do you keep a file in which you maintain

1   get rid of those notes or clean them off your desk and

2   dispose of them until the particular issue has been

3   resolved; correct?

4      A. Um-hmm, yes.

5      MR. CARNAGEY: Let's take a moment. I'm going

6   to talk to Mr. Levine.

7      (Brief recess taken.)

8      MR. CARNAGEY: I don't have any more questions.

9      MS. TRIPOLI: I do.

10  EXAMINATION BY MS. TRIPOLI:

11      Q. Ms. Banks, you are the primary fund manager for

12   the AP bond fund; is that correct?

13      A. Yes.

14      Q. And in terms of your contact with the city

15   attorney's office that is at issue in terms of

16   Exhibit 38, did you contact the city attorney's office

17   to seek legal advice relative to your duties relative

18   to the AP bond fund?

19      A. Yes. Because one of the issues related to Ed's

20   layoff was that he was solely funded from the AP bond.

21   I wanted to make sure, do kind of a check and balance

22   with her.

23      Q. And at the same time you were also assisting

24   Mr. Benoit in some of the administrative matters;

25   correct?

1           MR. CARNAGEY:  Objection.  Leading.

2    BY MS. TRIPOLI:

3        Q.  Did you testify earlier that you were also

4    assisting Mr. Benoit on some of the administrative

5    matters which he was pulling double duty?

6        A.  Yes.

7        Q.  Was one of the reasons you contacted the city

8    attorney's office was to seek legal advice relative to

9    the assistance you were providing to Mr. Benoit?

10       A.  Yes.

11       Q.  And is that why there was a follow-up phone

12   call between yourself and the city attorney's office

13   and Mr. Benoit?

14          MR. CARNAGEY:  Still leading.  Objection.

15          THE WITNESS:  Yes.

16   BY MS. TRIPOLI:

17       Q.  Why -- What's your understanding about why

18   there was a subsequent telephone call with Mr. Benoit,

19   the city attorney's office and yourself?

20       A.  Why did I think?

21       Q.  Why did that happen to your understanding?

22       A.  If you know Paul, Paul has to hear things

23   directly from the source.  So I think that he needed to

24   hear Teri say the things that I had already heard her

25   say.

1    Q.  And all the references that we've been having

2  in this part of your deposition about the city

3  attorney's office were the conversations with one or

4  more of the attorneys in the city attorney's office?

5    A.  One.

6    Q.  Which attorney was that?

7    A.  Teri Highsmith.

8    Q.  Now, in terms of your testimony earlier that

9  you believe that the piece of paper or the notepad at

10  that time only contained the administrative leave entry

11  that you believe that was sitting on the top your

12  desk --

13    A.  Yes?

14        MR. CARNAGEY:  Objection.  I didn't hear her

15  say anything about a "notepad."

16  BY MS. TRIPOLI:

17    Q.  Ms. Banks, in terms of the original of

18  Exhibit 38 when it just contained the top half about

19  administrative leave, what was the physical form of

20  that document?

21    A.  I believe it's just a sheet of paper.  I use

22  scratch paper.

23    Q.  So not the type of pad like this (indicating)?

24    A.  No.  I reuse paper.  It might have even had a

25  flyer on the back or something.  I reuse paper all the

1  STATE OF CALIFORNIA     )
2                          )
3  COUNTY OF ALAMEDA       )
4
5       I, JEANNIE M. CHIMPKY, do hereby certify:
6       That NANETTE BANKS, in the foregoing deposition
7  named, was present and by me sworn as a witness in the
8  above-entitled action at the time and place therein
9  specified;
10       That said deposition was taken before me at
11  said time and place, and was taken down in shorthand by
12  me, a Certified Shorthand Reporter of the State of
13  California, and was thereafter transcribed into
14  typewriting, and that the foregoing transcript
15  constitutes a full, true and correct report of said
16  deposition and of the proceedings that took place;
17       IN WITNESS WHEREOF, I have hereunder subscribed
18  my hand this 8th day of August 2005.
19
20
21
22
23  _____
    JEANNIE M. CHIMPKY, CSR No. 12742
24  State of California
25