LINDA A. TRIPOLI (SBN 100389)
Attorney at Law
One Blackfield Drive, No. 403
Tiburon, California 94920
Telephone: (415) 380-8822
Facsimile: (415) 380-8868

Attorney for Defendants
CITY OF ALAMEDA and JAMES FLINT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| EDWARD LEVINE<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF ALAMEDA, a California Charter City, and JAMES M. FLINT, both individually and as City Manager for the City of Alameda,<br><br>Defendants. | Case No. C04-01780 CRB/ADR<br><br>**THIRD SUPPLEMENTAL DECLARATION OF LINDA A. TRIPOLI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Fed. R. Civ. P. 56]**<br><br>Date: December 9, 2005<br>Time: 10:00 a.m.<br>Ctrm.: 8 (19th Floor)<br><br>Trial Date: None |

I, LINDA A. TRIPOLI, hereby declare as follows:

1.      I am the attorney of record for Defendants in this action.

2.      Attached hereto as Exhibit 1 are true and correct excerpts from the depositions of Karen Willis taken on June 14, 2005 and October 26, 2005 in connection with this action.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of November, 2005 at Tiburon, California.

/S/
LINDA TRIPOLI

---

THIRD SUPP. DECL. OF LINDA A. TRIPOLI IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT

Levine v. City of Alameda and Flint
Case No. C-04-01780 CRB/ADR                    -1-

EXHIBIT 1

Page 82

[1] EXAMINATION BY MS. TRIPOLI:

[2] Q. With regard to the February 26th, 2004 letter

[3] that I think we've decided is Exhibit 4 to Mr. Levine's

[4] deposition, in your letter you indicate that you would,

[5] quote, unquote, "While I would be happy to meet with you

[6] to listen to your concerns and answer any questions you

[7] have," and the sentence continues. When you communicated

[8] to Mr. Levine that you were happy to meet with him to

[9] listen to his concerns, what concerns were you referring

[10] to?

[11] A. He had specifically said, and I don't have that

[12] in front of me, but how he thought that the layoff was

[13] really just a way to -- it really wasn't the real reason

[14] that they were letting him go, that it was really just

[15] like a pretext to the real reason to get rid of him.

[16] Q. When you offered to meet with him, you were

[17] indicating to him that you were going to listen to those

[18] concerns on his behalf?

[19] MR. CARNAGEY: Objection. Leading

[20] BY MS. TRIPOLI:

[21] Q. With regard to your offer to meet with him, and

[22] as I understand, he never did request to meet with you; is

[23] that correct?

[24] A. He never did request to meet with me. He did

[25] come in one day for I think the purpose of going through

Page 83

[1] the separation with the human resources department, and I

[2] had invited him in to my office, so we talked briefly at

[3] that time.

[4] Q. Did he indicate to you what he had decided to do

[5] relative to pursuing his issues with the city about his

[6] layoff?

[7] A. He said that, because I did mention to him about

[8] my offer to meet and he said no, he was going to go other

[9] means. I didn't ask him specifically what that meant.

[10] Q. If Mr. Levine had met with you and presented

[11] information to you that indicated to you that there were

[12] potential, there was potential pretext to his layoff, what

[13] would you have done in that instance?

[14] MR. CARNAGEY: Objection. Hypothetical, calls

[15] for speculation.

[16] THE WITNESS: As human resources director, if

[17] somebody brings me information anything that looks like

[18] it's a problem like that, I would take it to the city

[19] manager more than likely to visit with the city manager

[20] about it or I might take it to our attorney's office for

[21] them to review as well.

[22] BY MS. TRIPOLI:

[23] Q. Would it make any difference to you that the

[24] decision in question was the decision of the city manager?

[25] MR. CARNAGEY: Same objection. Improper

Page 84

[1] hypothetical, calls for speculation.

[2] THE WITNESS: No, it would not, because many

[3] times the role of the human resources director is going to

[4] be to let a city manager know if the decision that he or

[5] she is making can be risky to share what that risk may be.

[6] BY MS. TRIPOLI:

[7] Q. Just once again, the letter that you were

[8] referring to that you were responding to from Mr. Levine,

[9] is that the February 25th, 2004 letter to Mr. Flint that I

[10] think you decided was Exhibit 3 to Mr. Levine's

[11] deposition?

[12] A. Yes, that's the letter.

[13] MS. TRIPOLI: That's all I have.

[14] EXAMINATION BY MR. CARNAGEY:

[15] Q. With regards to the questions that Ms. Tripoli

[16] asked you, the letter that was sent to Mr. Levine

[17] notifying him of his layoff, which I think we went over in

[18] your last deposition, Mr. Flint indicated that the reason

[19] for the layoff was the withdrawal of funding by the

[20] A.R.R.A. for Mr. Levine's position.

[21] A. Correct.

[22] Q. Did you have any reason to believe prior to

[23] February 24th, 2004 when Mr. Levine's final layoff date

[24] occurred that the reason stated by Mr. Flint was not true

[25] and accurate?

Page 85

[1] A. I had no reason to believe that.

[2] Q. Did you have any independent knowledge of the

[3] methods in which Mr. Levine's position had been funded

[4] prior to that date?

[5] A. No.

[6] Q. Did you have any reason to believe that Mr. Flint

[7] would have in any way changed that reason for the layoff

[8] of Mr. Levine had Mr. Levine spoken to you and accepted

[9] your invitation to meet with him?

[10] A. I'm sorry, I don't understand the question.

[11] Q. Do you know whether Mr. Levine had any special

[12] knowledge about the funding or withdrawal of funding for

[13] his position as of February 27, 2004?

[14] A. No.

[15] Q. Do you know whether the city manager would have

[16] changed his position regarding Mr. Levine's layoff had Ed

[17] Levine accepted your invitation to meet with him?

[18] MS. TRIPOLI: The objection is incomplete

[19] hypothetical and it calls for speculation.

[20] You can answer it if you understand it.

[21] THE WITNESS: I'm still not sure I understand it.

[22] BY MR. CARNAGEY:

[23] Q. As I understand your response to Ms. Tripoli's

[24] questions, you're saying that had Mr. Levine met with you

[25] and raised his concerns about the basis of his layoff, you

Page 86

[1] would have taken that to the city manager and/or the city

[2] attorney's office and proceeded further with the process,

[3] correct?

[4]     A.    If what he brought to me showed me that yes,

[5] there was good reason to believe that it was for reasons

[6] other than the A.R.R.A. funding, A.R.R.A. funding going

[7] away, that there was more to it.

[8]     Q.    So Mr. Levine would have had to bring some kind

[9] of independent information to you that would have led you

[10] to be suspicious of the stated reason for his layoff

[11] before you would have proceeded any further with the city

[12] manager or the city attorney, correct?

[13]     MS. TRIPOLI:     Objection. Vague and ambiguous to

[14] "independent information."

[15]     THE WITNESS:     I'm not sure how to answer, but I

[16] would have to have something.

[17] BY MR. CARNAGEY:

[18]     Q.    He would have had to bring some kind of

[19] information to you other than what you had in front of you

[20] at the time in order for you to proceed further with his

[21] claim of pretext and sham, correct?

[22]     A.    Yes.

[23]     MR. CARNAGEY:     Let's take a break.

[24]     (Recess taken from 10:55 to 11:00 a.m.).

[25]

Page 87

[1] BY MR. CARNAGEY:

[2]     Q.    Going back to this issue of the P.I.P. process,

[3] to your knowledge, is the availability of that process

[4] communicated to the City of Alameda's management employees

[5] in any way?

[6]     A.    I don't know if it was communicated to them. It

[7] is or it was on our, I don't know what they call that, the

[8] portal part of our web page. There was an example of

[9] Performance Improvement Plans there.

[10]     Q.    When you say portal part of the web page, what

[11] are you referring to?

[12]     A.    The portal means it's only for, it's a web

[13] access, but only for the internal so you can access

[14] documents and things internally to the organization.

[15]     Q.    What you're saying is managers could go on to

[16] that portal page, and part of it would show a prompt to

[17] the P.I.P. process form?

[18]     A.    There would be a section on forms, and I think it

[19] was forms under the human resources and shows an example

[20] of a Performance Improvement Plan.

[21]     Q.    What other types of information are on that

[22] portal part of the web site?

[23]     A.    The portal part of the web no longer exists. So

[24] what was available really were the forms for human

[25] resources that employees or supervisors could use so they

Page 88

[1] could easily get the forms and just download them and send

[2] them either electronically or print them and send them to

[3] human resources.

[4]     Q.    When was that portal discontinued?

[5]     A.    It wasn't that long ago, so I don't remember the

[6] date. It's been subsequent to Mr. Levine leaving.

[7]     Q.    When you first learned of Mr. Levine's layoff,

[8] were you aware that there was a P.I.P. process in

[9] development for him?

[10]     A.    Yes.

[11]     Q.    Did that raise, the existence of the P.I.P.

[12] implementation and development, did that raise any

[13] concerns to you about his layoff situation?

[14]     A.    Concerns how?

[15]     Q.    Did it give you cause to have any doubts or

[16] suspicions about the timing of the Performance Improvement

[17] Plan development in conjunction with the layoff notice?

[18]     A.    I did question whether, more specifically I

[19] questioned why he was being laid off, and they, meaning

[20] Mr. Benoit and Mr. Flint, both said that the A.R.R.A.

[21] funding for this program was going away. If this was not

[22] going away, then they would still be proceeding ahead with

[23] the Performance Improvement Plan for Mr. Levine. So it

[24] was independent of that performance improvement process.

[25]     Q.    When did Mr. Benoit and Mr. Flint indicate to you

Page 89

[1] that the P.I.P. would go forward but for the withdrawal of

[2] the A.R.R.A. funding for Mr. Levine's job?

[3]     A.    Only when I spoke with them about the layoff.

[4]     Q.    When was that again?

[5]     A.    I don't know. It would have been sometime in

[6] February probably, late January, February.

[7]     (Discussion off the record)

[8] BY MR. CARNAGEY:

[9]     Q.    What are the consequences of an employee refusing

[10] to comply with a Performance Improvement Plan? In other

[11] words, if an employee were to say I'm not going to

[12] participate in the Performance Improvement Plan, what

[13] would be the consequences of that refusal?

[14]     A.    They would in essence be refusing to do their

[15] job, their work, which is insubordination which could lead

[16] to discipline.

[17]     MS. TRIPOLI:     I think there was ambiguity in your

[18] question because the topic has come up, you're talking

[19] about if they refuse to work or they refuse to agree that

[20] they are under a performance improvement.

[21] BY MR. CARNAGEY:

[22]     Q.    If they refuse to agree to the Performance

[23] Improvement Plan, not refuse to do their work, they simply

[24] refuse to participate in the Performance Improvement

[25] Plan's implementation?

Page 102

[1] there were any notes.

[2] Q. Did you search for documents other than the job

[3] description and the notes?

[4] A. Not that I recall. I don't remember what all the

[5] stuff was that you were requesting. I searched through my

[6] file.

[7] Q. Did you talk with anyone other than I assume you

[8] talked with Ms. Tripoli about the production request,

[9] correct?

[10] A. Yes.

[11] Q. Did you talk to anyone in the city's employ other

[12] than Ms. Tripoli with respect to the document request?

[13] A. No.

[14] Q. You didn't search any files or ask any other

[15] persons other than yourself in the city's employ to

[16] produce any documents that might be responsive to the

[17] request for production?

[18] A. No.

[19] Q. Why is that?

[20] A. I don't know that I thought about that.

[21] MS. TRIPOLI: In terms of myself as the attorney,

[22] I coordinated with the city attorney's office to make sure

[23] that there weren't any other documents responsive. The

[24] ones under Karen's control were her job description and

[25] looking to see if she had any notes or anything from the

Page 103

[1] meeting. But the job description I believe is responsive

[2] to number two, three, I think, and five and six.

[3] MR. CARNAGEY: I want to know just for the record

[4] so that we're assured that a thorough a search and as

[5] reasonably diligent a search as possible was made by

[6] either Ms. Willis or someone else in the city's employ,

[7] including yourself as counsel in this case. And if you're

[8] representing to me that you did talk with other entities

[9] and did attempt reasonably to locate documents responsive

[10] to the subpoena, that will satisfy me.

[11] MS. TRIPOLI: Karen obviously would have control

[12] over the H.R. documents which would have been any notes

[13] that she would have, any files she would maintain, her job

[14] description. And then with regard to the other documents,

[15] that again through coordination with the city attorney's

[16] office who would know whether there were such documents,

[17] there weren't any other documents.

[18] MR. CARNAGEY: Thank you.

[19] BY MR. CARNAGEY:

[20] Q. In production of the human resources director job

[21] description, what is it, this is your job description,

[22] right?

[23] A. Yes.

[24] Q. That's been in effect since you've been employed

[25] by the City of Alameda, insofar as you know?

Page 104

[1] A. As far as I know, yes.

[2] Q. What is it about your job description that

[3] relates to the Request for Production of Documents

[4] attached to the subpoena served on you? Let my ask you a

[5] different question.

[6] Did you produce the job description for your

[7] position because you felt as though it would be responsive

[8] to some of these requests insofar as it describes what you

[9] do in your job and how you were acting in your capacity

[10] when you dealt with the layoff issues surrounding

[11] Mr. Levine's employment?

[12] A. Yes.

[13] Q. I'm going to put this aside for a moment and

[14] review it at a break and ask questions about it. In prior

[15] testimony you had indicated that you met with Mr. Levine

[16] after he had been given his layoff notice on

[17] February 17th, 2004; is that correct?

[18] A. Yes.

[19] Q. When you met with Mr. Levine in our last session

[20] or session before you couldn't recall the exact date, am I

[21] correct about that?

[22] A. That's correct.

[23] Q. Do you have any better recollection of the date

[24] on which you met with Mr. Levine at this time?

[25] A. I do not. I searched my calendar. I didn't have

Page 105

[1] any record of it.

[2] Q. When we described this encounter with Mr. Levine

[3] as a meeting, was this a scheduled meeting?

[4] A. No.

[5] Q. How did it come about that Mr. Levine had this

[6] discussion with you on February 26th or 27, 2004?

[7] A. He had come into the human resources department,

[8] I don't know for what, and I happened to see him. He was

[9] talking with some of the other folk on the staff, and I

[10] invited him into my office.

[11] Q. Did you indicate to Mr. Levine why you were

[12] inviting him into your office at that time?

[13] A. Indicate only in the sense that I asked him how

[14] he was doing and asked if he had gotten my letter with

[15] regard to the opportunity to meet because he had never

[16] called me to schedule such a meeting.

[17] MS. TRIPOLI: I think you referenced the 26th or

[18] 27th as the date, and I think that's the date that were

[19] potentially identified by Mr. Levine, so I wanted to note

[20] that Karen doesn't have a specific recollection whether it

[21] was the 26th or the 27th.

[22] BY MR. CARNAGEY:

[23] Q. But you did meet with Mr. Levine or you had this

[24] discussion with him in the H.R. offices after you wrote

[25] your letter to him responding to his request for a

Page 106

[1] pretermination hearing; is that correct?

[2]  A.   Yes.

[3]  Q.   That was on February 26th, 2004, correct?

[4]  A.   **The letter, I would have to go back and look.**

[5]  Q.   Let me show you Exhibit 4 in Mr. Levine's

[6] deposition.

[7]  A.   Yes.

[8]  Q.   Do you recall on February, did you write this

[9] letter on February 26th?

[10]  A.   **Did I write it on the 26th, I don't know if I**

[11] **wrote it on the 26th, but I wrote the letter.**

[12]  Q.   Do you recall what time of day, morning or

[13] afternoon?

[14]  A.   **No.**

[15]  Q.   When you met with Mr. Levine, whatever date it

[16] was when he came into the H.R. office, how long did your

[17] discussion with him last?

[18]  A.   **Less than five minutes.**

[19]  Q.   What did you talk about?

[20]  A.   **What he was going to be doing, just visiting a**

[21] **little bit in general. I asked him about if he had gotten**

[22] **the letter, he said he had. I mentioned that he had not**

[23] **scheduled a meeting with me. He said he decided, words to**

[24] **the effect of take another route or look at other means.**

[25]  Q.   When you met with Mr. Levine, did you have any

Page 107

[1] authority to change the decision to lay him off?

[2]  A.   **I think in my capacity as human resources**

[3] **director that since I'm over the human resources functions**

[4] **which layoffs will be one of those, that I could certainly**

[5] **make a decision as to whether or not that layoff should go**

[6] **forward.**

[7]  Q.   In other words, what I'm asking you, as I

[8] understand it, Mr. Flint made the decision to lay off

[9] Mr. Levine, correct?

[10]  A.   **As far as I know, yes.**

[11]  Q.   We had some previous testimony that Mr. Flint is

[12] the ultimate authority for deciding personnel matters at

[13] the City of Alameda; is that correct?

[14]  A.   **Yes.**

[15]  Q.   Are you saying that you had the authority as of

[16] February 26th, 2004 to overrule Mr. Flint's decision?

[17]  A.   **No. I could certainly look at if there was**

[18] **information that came to my attention that would cause me**

[19] **to believe that the decision was an improper decision, I**

[20] **could certainly take that back to Mr. Flint and explain**

[21] **the reasons for my decision to tell him that I believed**

[22] **that the layoff maybe should not occur.**

[23]  Q.   That is the type of information we talked about

[24] in one of your other depositions that Mr. Levine would

[25] have to present you with some kind of new information that

Page 108

[1] would lead you to go to Mr. Flint and say this may not be

[2] a proper decision regarding Mr. Levine's layoff?

[3]     MS. TRIPOLI:    Object to the extent it doesn't

[4] exactly -- I don't know if it does or doesn't, I don't

[5] know if it exactly quotes her answer before.

[6]     MR. CARNAGEY:     I'm trying not to cover the same

[7] ground again.

[8]     MS. TRIPOLI:     I think you're close, and I would

[9] note that objection to the extent it's not completely

[10] correct.

[11] BY MR. CARNAGEY:

[12]  Q.   You can go ahead and answer the question.

[13]  A.   **But now I've forgotten it. I think the answer**

[14] **was going to be yes, but I'm sorry, if you can repeat it.**

[15]  Q.   I'll rephrase it. If I understand your testimony

[16] correctly, Mr. Levine would have been, it would have been

[17] incumbent on Mr. Levine to bring you some type of

[18] information that would have led you to go to Mr. Flint and

[19] indicate on the basis of Mr. Levine's new information or

[20] this other information, the layoff may not be proper,

[21] correct?

[22]  A.   **Yes.**

[23]  Q.   Mr. Flint would then be responsible for making a

[24] decision whether or not to reverse his own decision; is

[25] that correct?

Page 109

[1]  A.   **Yes.**

[2]  Q.   At the time you wrote the February 26th, 2004

[3] letter to Mr. Levine, was there anyone or any entity or

[4] any person in the City of Alameda that possessed the

[5] authority to overrule Mr. Flint's decision to lay off

[6] Mr. Levine?

[7]  A.   **City council, if that's what you mean, city**

[8] **council could obviously overrule the city manager.**

[9]  Q.   Any other entity?

[10]  A.   **I don't know about overruling, but certainly**

[11] **there's influence. The city attorney's office has a good**

[12] **deal of influence.**

[13]  Q.   I'm not asking about influence, I'm asking about

[14] authority to change Mr. Flint's decision to lay off

[15] Mr. Levine.

[16]     MS. TRIPOLI:    You mean legal authority?

[17]     MR. CARNAGEY:     I didn't want to say legal because

[18] then I was afraid I would get an objection.

[19] BY MR. CARNAGEY:

[20]  Q.   What I wanted to know is who with respect to

[21] entities or persons had the power to unilaterally overrule

[22] a personnel decision made by Mr. Flint as of

[23] February 26th, 2004?

[24]     MS. TRIPOLI:    Maybe I could clarify. I'm not

[25] trying to interfere because the City of Alameda is a city

Page 122

[1] ordinance, you use the process in those particular rules.

[2] If there aren't any, then it would defer back to the

[3] hearing before the city manager, which is why we have

[4] hearings before the city manager for disciplinary actions

[5] that are less than 30 days. The civil service rules only

[6] provide for hearings before them if the discipline is

[7] greater than 30-day suspensions.

[8] Q. In the case of a discharge for cause, which by

[9] definition is for more than 30 days because they are

[10] discharged?

[11] A. Yes.

[12] Q. That type of an appeal would go to the civil

[13] service commission?

[14] A. Yes. We've typically given the option to the

[15] employee who is appealing it to go to the city manager or

[16] the civil service board.

[17] Q. Is that the case even when the city manager is

[18] the person making the discharge decision?

[19] A. I don't recall the city manager making any

[20] discharge decisions.

[21] Q. As you sit here today, you can't recall a

[22] situation where the city manager has made a discharge

[23] decision and then the affected employee has appealed to

[24] the city manager?

[25] A. A discharge for cause, you're talking about a

Page 123

[1] disciplinary type discharge, no. The city manager since

[2] I've been here has not made that type of a decision.

[3] Q. That's usually made by a division head or a

[4] department head; is that correct?

[5] A. That's correct.

[6] Q. Then those decisions can be appealed up through

[7] either the city manager or the civil service board,

[8] depending on the length and type of discipline?

[9] A. Or the choice of the appellant, yes.

[10] MS. TRIPOLI: Can we take a short break?

[11] MR. CARNAGEY: Sure.

[12] (Recess taken from 10:55 to 11:15 a.m.).

[13] BY MR. CARNAGEY:

[14] Q. Returning to the subject of your discussion with

[15] Mr. Levine around the time his layoff became effective, I

[16] think you testified that you had asked Mr. Levine about

[17] his having not scheduled a meeting with you; is that

[18] correct?

[19] A. Something to that effect, yes.

[20] Q. He responded that he was going in a different

[21] direction?

[22] A. That's correct.

[23] Q. When you asked him about scheduling of a meeting,

[24] were you referring to your letter of February 26th in

[25] which you indicated you would be happy to meet with him to

Page 124

[1] listen to his concerns?

[2] A. Yes.

[3] Q. In Exhibit 26 you refer to being happy to listen

[4] to your concerns, Mr. Levine's concerns, and answer any

[5] questions regarding layoff procedures, post layoff and

[6] retirement benefits. Had Mr. Levine scheduled a meeting

[7] with you, would those have been the subjects you would

[8] have discussed with him?

[9] A. We absolutely would have discussed those, but

[10] anything else that he wanted to discuss he could have

[11] brought it certainly.

[12] Q. Was it your intention when you wrote Exhibit 26

[13] to be offering Mr. Levine an opportunity to have a

[14] pretermination hearing with you?

[15] A. No. It was not an opportunity to have a

[16] pretermination. It wasn't going to be a full evidentiary

[17] hearing, but if he brought me some factual information

[18] that said that the reason why this layoff was really not

[19] the real reason he was being let go, then I certainly

[20] would have listened to that information, investigated it

[21] and made some determination based on that.

[22] Q. Would I be correct in my understanding that

[23] Mr. Levine's letter of February 25th in which he requested

[24] a pretermination hearing and indicated his position that

[25] the basis for the layoff, i.e., withdrawal of funding by

Page 125

[1] A.R.A. resulting in elimination of his position is not

[2] factual and represents a sham and pretext for my actual

[3] termination, that that letter was not adequate to trigger

[4] any further action by you vis-a-vis raising the subject

[5] with Mr. Flint?

[6] A. It didn't have -- it was just an allegation at

[7] that point. It didn't have any information as to why he

[8] would think that, where somebody might be able to look to

[9] find out if there was indeed something else going on with

[10] that funding. It was enough only in the sense that the

[11] letter went to Mr. Flint, as I recall, and Mr. Flint

[12] brought it to my attention, and we talked a little bit

[13] about it. That's when I investigated to see whether or

[14] not he was entitled to that type of a hearing. I thought

[15] that he was not because it was a layoff. It was not a

[16] termination for cause.

[17] Q. The allegation made in Mr. Levine's letter to you

[18] on February 25th, 2004, that wasn't adequate to trigger

[19] any further action on your part with respect to the merits

[20] of the layoff itself?

[21] A. Correct.

[22] Q. I note that Exhibit 3 has a date stamp on it

[23] "Received, City of Alameda '04, February 26, 9:13 a.m.

[24] Personnel Department," is that correct?

[25] A. Yes.

Page 142

[1] A.    If they have been terminated for cause, they are
[2] entitled to a posttermination hearing, yes.
[3] Q.    Under the M.O.U., isn't it true that there's a
[4] whole process that occurs in trying to adjust the
[5] situation prior to a hearing, correct?
[6] A.    There is a grievance procedure in the M.O.U.
[7] that's for disputes of the M.O.U. where --
[8] Q.    I'm not asking about that. I'm asking about the
[9] appeal rights under the discharge for cause provision.
[10] A.    There's really just the one step. There is a
[11] posttermination hearing before either the city manager or
[12] the civil service board.
[13] Q.    There's also a process in the document that we
[14] had gone over earlier that says that the employee has a
[15] right to appeal to either the civil service board or the
[16] city manager?
[17] A.    Yes.
[18] Q.    That appeal is different than the posttermination
[19] hearing?
[20] A.    No. That is the posttermination hearing.
[21] Q.    With respect to your discussions with Mr. Levine
[22] on or around February 26th, 2004, did you have any
[23] discussions with Mr. Flint about the content of your short
[24] meeting with Mr. Levine?
[25] A.    I don't recall.

Page 143

[1] Q.    Do you recall whether you had any such
[2] discussions with any other person in the employ of the
[3] city?
[4] A.    With the city attorney's office, the assistant
[5] city attorney.
[6] Q.    This is after you had discussions with
[7] Mr. Levine?
[8] A.    Yes.
[9] Q.    Do you recall whether you had any discussions
[10] about your short conference with Mr. Levine with anybody
[11] other than the city attorney's office?
[12] A.    Not that I recall.
[13] Q.    Did you ever discuss with Mr. Flint whether or
[14] not Mr. Levine's claim that his layoff was pretextual and
[15] not factually based should be further explored or
[16] investigated?
[17] A.    No, I don't recall having that.
[18] Q.    Do you recall whether you had any discussions
[19] with Mr. Flint about any aspect of Mr. Levine's
[20] termination layoff after February 26th, 2004 except with
[21] respect to what's going on in this litigation?
[22] A.    No, not that I recall.
[23] Q.    Do you know whether Mr. Flint had any discussions
[24] with anyone else about Mr. Levine's layoff situation after
[25] February 26th, 2004 aside from as is related to this

Page 144

[1] litigation?
[2] A.    No.
[3] Q.    I'm trying to separate what's happened since we
[4] filed suit in this case from what happened before that
[5] time; you understand that?
[6] A.    I do understand.
[7] Q.    How many times did you speak with the city
[8] attorney about your short meeting you had with Mr. Levine?
[9] A.    As I recall once.
[10] Q.    As of the time that you received the
[11] correspondence from Mr. Levine requesting a pretermination
[12] hearing and the time that you had the short meeting with
[13] him with respect to his layoff, you were aware that
[14] previously there had been a Performance Improvement Plan
[15] process implemented with respect to Mr. Levine's
[16] performance of his job duties; is that correct?
[17] A.    I knew that there was a Performance Improvement
[18] Plan being developed for Mr. Levine, I don't know about
[19] implemented.
[20] Q.    That's what I was trying to get to when I said
[21] Performance Improvement Plan process. You knew that there
[22] was a process going on as of the time that you met with
[23] Mr. Levine regarding improving his performance; is that
[24] correct?
[25] A.    I knew there was a plan being developed for him,

Page 145

[1] yes.
[2] Q.    Had you ever seen any drafts of that plan?
[3] A.    Only ones I ever saw were the one you presented
[4] to me during these depositions.
[5] Q.    You had not seen any drafts of a proposed
[6] Performance Improvement Plan prior to the time you met
[7] with Mr. Levine in February 2004?
[8] A.    No.
[9] Q.    Had Mr. Levine indicated to you prior to
[10] February 26th, 2004 that he felt that the Performance
[11] Improvement Plan was the beginning of a process to lead to
[12] his termination?
[13] A.    He did tell me that he believed it to be a form
[14] of discipline, yes.
[15] Q.    You disagreed with his position, correct?
[16] A.    I did.
[17] Q.    Did the existence of the proposed Performance
[18] Improvement Plan and the process developing it have any
[19] bearing on your view of Mr. Levine's claim that his layoff
[20] was a pretext and a sham?
[21] A.    Did it have any bearing?
[22] Q.    Yes.
[23] A.    I was of course concerned that there was a
[24] Performance Improvement Plan, but I was assured that his
[25] layoff was strictly due to the funding being eliminated or

Page 154

[1] Assuming I'm correct, who would be available at this stage

[2] of the case to hear Mr. Levine's appeal regarding the

[3] basis of his layoff?

[4]      **MS. TRIPOLI:**      I don't think that's an appropriate

[5] question for this witness at this stage. Whatever the

[6] judge decides the requirements are, then the city will

[7] evaluate that and communicate. I don't think this witness

[8] is in a position to be able to answer that question at

[9] this time.

[10]      **MR. CARNAGEY:**      Let me approach it a different

[11] way. The reason I'm interested in this obviously is

[12] because I assume the city is going to make some proposal

[13] about someone or some entity or person that would be

[14] available to hear Mr. Levine's appeal, so to speak, if the

[15] Court were to order it.

[16]      **MS. TRIPOLI:**      Actually, I wasn't planning on that

[17] argument. Which part of the supplemental order are we

[18] looking at?

[19]      **MR. CARNAGEY:**      Number two, whether and to what

[20] extent this legal standard which is previously referred to

[21] for due process may be altered in this instance by

[22] requiring an opportunity be heard by a third party.

[23]      **MS. TRIPOLI:**      As I understood the judge, he

[24] understood, and I think the cases indicate that the third

[25] party is someone outside of the city. So I don't think

Page 155

[1] that this witness can answer what's potentially a legal

[2] question, and if a judge orders a hearing before someone

[3] outside the City of Alameda, who that person would be.

[4]      **MR. CARNAGEY:**      Let me ask you in a different way.

[5] I don't want to belabor the point because I think you may

[6] be correct.

[7] **BY MR. CARNAGEY:**

[8]    **Q.**      Aside from the city council, the civil service

[9] commission and any possible arbitrator that might be

[10] appointed under the M.O.U., is there any other entity or

[11] person that you know of that would serve, could serve to

[12] hear Mr. Levine's appeal within the city? I'm talking

[13] about persons or entities within the city.

[14]      **MS. TRIPOLI:**      I think what you're talking about

[15] is theoretically entities who could overrule Jim Flint's

[16] decision. You had an arbitrator in there, and under the

[17] provisions, an arbitrator isn't possible to do that.

[18] **BY MR. CARNAGEY:**

[19]    **Q.**      Because an arbitrator is not a binding decision,

[20] correct?

[21]    **A.**      **Under this M.O.U, correct.**

[22]    **Q.**      Aside from the civil service commission and the

[23] city council, is there any other entity or person within

[24] the hierarchy of the City of Alameda that has the

[25] authority to overrule the decision made by Mr. Flint to

Page 156

[1] lay off Mr. Levine?

[2]      **MS. TRIPOLI:**      Note for the record because the

[3] layoff is not subject to the civil service rules or the

[4] civil service appeal, it would be the city's position in

[5] this instance the civil service board would not have

[6] jurisdiction to hear an appeal about a layoff.

[7]      **MR. CARNAGEY:**      I understand that, but if the

[8] judge found that, in fact, Mr. Levine's claim of pretext

[9] and sham was legitimate and that it should have gone

[10] through a hearing process, it is quite possible that he

[11] will inquire whether there is some entity within the city

[12] jurisdiction that could hear the appeal.

[13]      **MS. TRIPOLI:**      I will tell you what I would tell

[14] the judge if he were to ask me that. If you are defining

[15] it as what entity would have legal ability under the

[16] charter who has authority over the city manager, it would

[17] be the city council.

[18]      You've heard Ms. Willis' testimony that the city

[19] believes that she had the authority under her job

[20] description to make a decision and have that decision

[21] implemented, but if you're talking about someone who has

[22] legal authority over the city manager under the charter,

[23] it would only be the city council. Does that answer your

[24] question?

[25]

Page 157

[1] **BY MR. CARNAGEY:**

[2]    **Q.**      Is that your understanding, Ms. Willis?

[3]    **A.**      **Yes.**

[4]    **Q.**      I didn't understand your testimony to be that you

[5] had authority within your job description to overrule

[6] Mr. Flint's layoff decision. Am I misunderstanding your

[7] testimony?

[8]    **A.**      **I believe I said that I believe I had the**

[9] **authority to decide whether or not, if that layoff was**

[10] **indeed for reasons other than what were the reasons given**

[11] **to me, the legitimate reasons of the funding going away,**

[12] **that I could make a decision to say that that layoff**

[13] **should not be done.**

[14]    **Q.**      I thought in your prior testimony you said that

[15] your authority would be only to go to Mr. Flint and say

[16] this is not appropriate, you should reconsider your

[17] action, correct?

[18]    **A.**      **I would certainly do that, and if Mr. Flint then**

[19] **said no, then I would more than likely take it to the city**

[20] **attorney because at this point in time I see that there's**

[21] **a major risk for the city, and my obligation is to make**

[22] **certain that it gets into the right authority.**

[23]    **Q.**      The city attorney, assuming that you were to

[24] raise the issue with that office, you said the city

[25] attorney could make efforts to influence Mr. Flint's

Page 158

[1] decision?

[2] A. The city attorney's office could do that or they

[3] could take it directly to the city council.

[4] Q. But the city attorney's office has no authority

[5] on its own to overrule a personnel decision made by

[6] Mr. Flint, correct?

[7] A. That may or may not be correct. I don't really

[8] know what their authority is, but I would go to them in

[9] any kind of dispute like that.

[10] Q. The city attorney's office is the entity that

[11] serves as the attorney in matters related to the city

[12] assuming they have no outside counsel, correct?

[13] A. Correct.

[14] Q. The city attorney, in some instances their office

[15] works in conjunction with outside counsel, correct?

[16] A. Correct.

[17] Q. Would I be correct that the city attorney's

[18] office is the advocate for the city's positions in various

[19] legal matters?

[20] A. Yes.

[21] Q. And the employees of the city attorney's office

[22] are employed by the City of Alameda, correct?

[23] A. Yes.

[24] Q. When you testified that the city attorney's

[25] office could take a matter of concern to the city council

Page 159

[1] and advise and consult with them, am I correct?

[2] A. Correct.

[3] Q. And then the city council could overrule

[4] Mr. Flint's decision, correct?

[5] A. Correct.

[6] Q. The city council could also order that there's

[7] enough of a dispute between Mr. Levine's position and

[8] Mr. Flint's position that there should be a hearing?

[9] A. I suppose they could do that. It's wide open

[10] what they could do.

[11] Q. To your knowledge and in your experience with the

[12] City of Alameda, does the city council normally conduct

[13] hearings regarding personnel matters?

[14] A. This council has not, no.

[15] Q. Have you been in situations where other councils

[16] you worked under have conducted hearings on personnel

[17] matters?

[18] A. Yes.

[19] Q. Where were you located when those types of

[20] proceedings occurred?

[21] A. County of Los Alamos.

[22] Q. They had a little bit different structure than

[23] the City of Alameda, correct?

[24] A. Yes.

[25] Q. At Los Alamos was there a provision that that

Page 160

[1] actually empowered or authorized city council to conduct

[2] personnel hearings?

[3] A. Yes.

[4] Q. Did the city council serve also as a civil

[5] service type commission or hearing board?

[6] A. No. They had that as a separate entity.

[7] Q. City of Alameda doesn't have that type of

[8] procedure, correct?

[9] A. No.

[10] Q. With respect to your job description which you

[11] produced today, you provided this document in response to

[12] several categories in the Request for Production of

[13] Documents attached to the subpoena, correct?

[14] A. Yes.

[15] Q. I think I asked you this earlier. Did you

[16] produce this document because it describes the authority

[17] that you have in your job position?

[18] A. Yes.

[19] Q. Are there any provisions in this document that

[20] you believe pertain directly to the situation with

[21] Mr. Levine and your meetings with Mr. Levine and the

[22] handling of his layoff?

[23] MS. TRIPOLI: You mean what her authority was in

[24] those meetings?

[25] MR. CARNAGEY: Right.

Page 161

[1] THE WITNESS: Only in the sense that it says,

[2] "Administrative head of the H.R. department and the final

[3] departmental authority in all matters of policy and

[4] operation and as the primary authority on human resources

[5] issues."

[6] BY MR. CARNAGEY:

[7] Q. That's the provision you were looking at

[8] specifically when you provided this document in response

[9] to the Request for Production?

[10] A. Yes.

[11] Q. Where is that?

[12] A. That's just under the definition.

[13] Q. What is your understanding of the phrase "the

[14] final departmental authority in all matters of policy and

[15] operation"?

[16] A. That I have the authority to make decisions over

[17] the department and any of the other matters over the

[18] policy and operations for that department.

[19] Q. That pertains to the human resources department?

[20] A. And policies of human resources, yes.

[21] Q. Is your prior testimony regarding the authority

[22] that you believed you had on the day you met with

[23] Mr. Levine on or about February 26th, 2004, is that the

[24] same type of authority that is reflected under this

[25] definition paragraph in the human resources director job

Page 162

[1] description?

[2]      **MS. TRIPOLI:**     Object. Vague and ambiguous. I

[3] don't know that, at least I remember specifically what it

[4] was she had talked about in her prior deposition.

[5]      **MR. CARNAGEY:**     I was talking about earlier today

[6] when I asked her about what authority she felt she had at

[7] the time she met with Mr. Levine and whether she felt she

[8] could serve as a neutral. That's what I'm directing my

[9] question towards.

[10]      **THE WITNESS:**     Could you repeat it?

[11] **BY MR. CARNAGEY:**

[12]     **Q.**     Does this paragraph we're looking at under

[13] definition in the human resources director job

[14] description, does that reflect the types of authority and

[15] functions that you were serving in at the time you met

[16] with Mr. Levine on or about February 26th, 2004?

[17]     **A.**     **Yes, I would think so.**

[18]     **Q.**     Is there any other authority that you believe you

[19] had under this job description that you could have

[20] exercised with respect to changing the layoff decision as

[21] of February 26th, 2004?

[22]     **A.**     **I don't know what you mean by any other**

[23] **authority. In my role as human resources director, I**

[24] **would certainly always look to see if, if Mr. Levine had**

[25] **brought me some factual kind of information that said that**

Page 163

[1] **there was some other reason that he was being laid off**

[2] **other than the reason that was given to him.**

[3]     **Q.**     Do you know of any process by which Mr. Levine

[4] would have been able to obtain such information relating

[5] to the basis of his layoff?

[6]     **A.**     **It could be most anything. He could have talked**

[7] **to others, he could have had other documents that showed**

[8] **different funding sources. I don't know. There's all**

[9] **sorts of things that I suppose he could have done.**

[10]     **Q.**     But there was no process in effect as of the date

[11] of Mr. Levine's layoff notice that allowed him to obtain

[12] such documentation or information from the city, was

[13] there?

[14]     **A.**     **I don't understand that question. We're a public**

[15] **entity. You can certainly request documents under the**

[16] **public records. I don't know what other kind of means are**

[17] **available to him. He might have had some information that**

[18] **led him to believe that the reason for his layoff was for**

[19] **reasons other than what were provided to him.**

[20]     **Q.**     When you say request for public records, you're

[21] talking about a Freedom of Information Act request?

[22]     **A.**     **I guess. I don't know what it's under.**

[23]     **Q.**     Did you advise Mr. Levine when you met with him

[24] on or about February 26th, 2004 that he should be

[25] obtaining new information to present in justification of

Page 164

[1] his position that the layoff was pretextual and a sham?

[2]     **A.**     **No.**

[3]     **Q.**     Do you know of anyone other than yourself who

[4] advised Mr. Levine that he should go out and obtain new

[5] information, anything that would serve to contradict the

[6] basis of his layoff?

[7]     **A.**     **Not that I know of, no.**

[8]      **MR. CARNAGEY:**     Let's take another short break.

[9]      (Recess taken from 12:45 to 12:50 p.m.)

[10] **BY MR. CARNAGEY:**

[11]     **Q.**     Just a couple more follow-up questions. With

[12] respect to your testimony about Mr. Levine not having

[13] contacted you to schedule a meeting after you sent out

[14] your February 26th, 2004 letter, did you ever call

[15] Mr. Levine to tell him that you wanted to schedule a

[16] meeting to discuss the situation?

[17]     **A.**     **No, I did not.**

[18]     **Q.**     Am I correct that the only discussion you had

[19] with Mr. Levine regarding some kind of a scheduled meeting

[20] was during the time that you had the brief discussions

[21] with him on or about February 26th, 2004?

[22]      **MS. TRIPOLI:**     When she called him into her

[23] office.

[24]      **THE WITNESS:**     I called him into my office and

[25] asked him if he had received my letter, he said he did, so

Page 165

[1] it was just kind of a follow-up on that.

[2] **BY MR. CARNAGEY:**

[3]     **Q.**     Was it your intention at that time that if

[4] Mr. Levine had asked to schedule some kind of a meeting,

[5] that it would have been held prior to the effective date

[6] of his termination?

[7]     **A.**     **Not necessarily, no.**

[8]     **Q.**     But that meeting would have taken place with you,

[9] correct?

[10]     **A.**     **Yes.**

[11]     **Q.**     With respect to matters in which a Skelly hearing

[12] is required at the City of Alameda, are you the person who

[13] normally conducts those kinds of hearings?

[14]     **A.**     **No.**

[15]     **Q.**     Is there someone in particular who is designated

[16] to conduct Skelly hearings?

[17]     **A.**     **The person who is recommending the discipline**

[18] **conducts the Skelly.**

[19]     **Q.**     Would that normally be a department head or a

[20] division head?

[21]     **A.**     **Yes, sir.**

[22]     **Q.**     I think you previously testified that when a

[23] division head or department head would conduct a Skelly

[24] hearing, that he or she would have the authority to

[25] overrule his or her own decision to impose a discipline;